[L. A. No. 9513. Department One.—December 17, 1928.]

PETROLEUM MIDWAY COMPANY, LTD. (a Corporation), Plaintiff and Respondent, v. MARIUS MOYNIER et al., Defendants; MARIUS MOYNIER et al., Cross-Complainants and Respondents, v. EMILE MOYNIER et al., Cross-Defendants and Appellants.

Milton H. Cohen and Jerome H. Kahn for Appellants.

J. Wiseman Macdonald for Cross-Complainants and Respondents.

CURTIS, J.—This proceeding was instituted to require the respondents Marius and Adrienne Moynier, husband and wife, and appellants Emile and Marie Moynier, husband and wife, and Abel and Jerondine Moynier, husband and wife, to interplead as to their respective rights in certain royalties received from the operation of oil-wells drilled upon lands beyonging to said respondent Marius Moynier. Both the appellants and respondents appeared in said action, and by proper and appropriate pleadings set forth their respective claims to said royalties. Respondents contended that they were the owners of and entitled to receive all of said royalties from plaintiff, while the appellants contended that said royalties belonged to both appellants and respondents in the proportion of one-third to re-

spondents, one-third to appellants Abel Moynier and his wife Jerondine Moynier, and one-third to Emile Moynier and his wife Marie Moynier. The respondent Marius Moynier and the appellants Abel and Emile Moynier are brothers, and were the owners in common of a certain tract of land containing something over one hudred acres of land. While such owners they subdivided said land under the name of the Moynier tract into ten lots, and by conveyances executed among themselves they became the owners in severalty of the lots in said tract as follows: Marius became the owner of lots 2, 9, and 10, containing 34.73 acres; Emile became the owner of lots 1, 5, and 6, containing 34.73 acres, and Abel became the owner of lots 3, 4, 7, and 8, containing 34.73 acres. While they were the owners in severalty of the respective lots in said tract, as just set forth, they, with their respective wives, entered into a lease of the whole of said property with A. M. Parsons on the ninth day of May, 1921. Said lease is what is known as an "oil lease," and by the terms thereof said Parsons was given the right to drill and prospect for oil and other mineral products upon said tract, in consideration whereof Parsons agreed to pay to the lessors the sum of $2 per acre per month until drilling operations thereon were begun, and upon the discovery and production of oil from said land a royalty of one-sixth of the oil produced thereon. By the terms of this lease Parsons was to commence the actual work of constructing and erecting a drilling rig upon said land within one year from the time title to the land upon which the first oil-well was to be drilled had been satisfactorily shown to be in said lessors. It was provided in this lease that "all rent and royalties hereunder shall be made to the credit of lessors at the office of Sentous Realty Company in the city of Los Angeles, California, and such payments shall constitute full compliance with the terms hereof; and relieve the lessee of obligation to see to distribution of such rent and royalties." The time within which work should be commenced under said lease was on May 19, 1922, by a written agreement, executed by all of the parties thereto, extended, and in said agreement of extension it was agreed that lots 5 and 7, which had been sold by their respective owners since the execution of the original lease, should be excluded from the operation of the lease.

It was further provided in this extension agreement that the clause of the original lease allowing a well to be drilled on the division line of any two lots in said tract should be abrogated, and that each well should be drilled wholly on one lot, and the owner of that lot should be the only participant in the royalty from such well. A second agreement extending further the time in which said lessee was to begin work under said lease was executed by all of the parties thereto on March 31, 1923. In this second extension agreement it was agreed that the monthly rental should be $500 per month instead of $2 per acre per month, and it was further provided therein that the lessors were authorized to sell any portion of the leased land, except for oil development, and in case of any such sale or sales the land so sold should be excluded from the terms of the lease. On April 24, 1924, the appellants and respondents entered into a supplemental agreement, the terms of which were substantially the same as those contained in the agreement granting the second extension as hereinbefore set out, except that the supplemental agreement contained a paragraph, numbered four therein, which was not contained in the second extension agreement. This paragraph reads as follows: ''Except as above, the said lease shall remain unchanged, and all previous extensions and amendments of said lease are superseded and canceled hereby.'' On the eleventh day of June, 1924, the appellants and respondents joined in a letter to the Associated Oil Company, which company had become the owner of said lease. In this letter said parties directed that the payment of said monthly rental should be made direct to the respective owners of said lots, as follows: to Marius Moynier, $247.18; to Abel Moynier, $120.82, and to Emile Moynier, $132. Said letter closed with the statement that, ''Except as herein modified, all the terms, covenants and conditions of said lease and said supplemental agreement shall remain in full force, and effect.''

Said lease was thereafter assigned to the plaintiff herein, and the royalties which are made the subject of this controversy are those arising from oil produced by plaintiff from wells drilled in pursuance of said lease upon lot 9 of said Moynier tract, the owner of which is Marius Moynier, one of the respondents herein. The trial court

held that respondent Marius Moynier was the owner of said lots 2, 9, and 10 of said tract, and that appellants had no interest in said lots; that respondents were entitled to receive all royalties to be paid to the lessors under said original lease in so far as said lease applied to or affected said lots 2, 9, and 10, and that appellants were not entitled to any of said royalties and had no interest therein. From the judgment awarding said royalties to respondents the appellants have appealed.

It is appellants' contention that the lease of the premises involved herein is a joint undertaking, and that the rights of the parties to said lease are joint and not several, and therefore that each of the lessors is the owner and entitled to receive an equal part or portion of all royalties which may accrue under said lease.

On the other hand, it is the contention of respondents that, as the several lots which were the subject of said lease were owned in severalty by the respective lessors, each owner was to receive exclusively all royalties from his own lands. The trial court held that the lease as finally modified by the parties thereto was uncertain in that it did not specify the amounts or proportions in which the royalties were to be distributed and paid to the several lessors, and over the objections of appellants admitted parol evidence to show the intention of the parties in respect to the distribution and payment of said royalties. Without going into any extended review of the evidence thus admitted by the court, we are satisfied that, if said evidence was properly admitted, it shows beyond question that it was the intention of the parties to said lease, at least after the execution of the first extension agreement already referred to, that each owner of lots embraced within said lease should be entitled to receive all of the royalties from his particular lot or lots. In the original lease the only provision regarding the payment of the royalty was that directing that all rent and royalties were to be paid to the credit of the lessors at the office of the Sentous Realty Company, and such payment should constitute full compliance with the terms of said lease. In the first extension agreement, which was dated May 19, 1922, the provision in the original agreement providing that a well might be drilled on the division line dividing

the property of two of the owners was changed as follows: "Each well shall be drilled wholly on one lot and the owner of that lot shall be the only participant in the royalty from such well, be it oil, gas or both, and the balance of lots included in this extension shall receive ground rental monthly in advance at the rate of two ($2.00) dollars per acre per month until drilling shall start thereon." In the second extension agreement, which was dated March 31, 1923, this rental was increased to $500 per month, but the above-quoted provision contained in the first extension agreement was in no way changed or altered. In the agreement of date April 24, 1924, as already noted, the terms of the second extension agreement were substantially restated, with a new paragraph added, designated as number four, which provided that, "Except as above, the said lease shall remain unchanged and all previous extensions and amendments of said lease are superseded and cancelled hereby." It is by virtue of this paragraph four of the agreement of April 24, 1924, that appellants claim that the first extension agreement of date May 19, 1922, and particularly that portion thereof which we have quoted above and which provides that each well shall be drilled wholly on one lot, and the owner of said lot shall be the only participant in the royalty from such well, was canceled and superseded by the agreement of April 24, 1924. This provision that the owner of the lot upon which a well is drilled shall be entitled to all royalties on oil produced by said well, as we have already seen, while set out in full in the first extension agreement, was not mentioned or referred to in the second extension agreement. Appellants therefore claim that the first extension agreement and all its terms and provisions were abrogated and canceled by the agreement of April 24, 1924. Appellants also contend that their position in this regard is further fortified by the letter of June 11, 1924, above referred to, which was signed by the appellants and respondents and directed to the Associated Oil Company, and which, after referring to the original lease and the agreement of April 24, 1924, directed the proportions in which said monthly rental of $500 should be paid to the three owners of said lots, and closed with the following statement: "Except as herein modified, all the terms, covenants and conditions of said lease and said

supplemental agreement shall remain in full force and effect.'' It appears from the testimony of those who prepared the supplemental agreement of April 24, 1924, that at the time of its preparation the Associated Oil Company was contemplating the purchase of the Moynier lease, and the supplemental agreement was drawn, and the Moyniers asked to sign the same, simply for the purpose of protecting the company, in case it purchased the lease, against any unrecorded agreement or any agreement of which the company had no notice or knowledge and which might affect its rights under the lease. The division of the royalties between the lessors was not discussed at the time of the preparation and execution of the supplemental agreement, and it was not drawn for the purpose of canceling or abrogating any agreement between the lessors as to the division of the royalties. The letter of June 11, 1924, was prepared and signed under much the same conditions and circumstances, and without any intention of disturbing the agreement between the lessors as to the payment of the royalties under the lease. We might at this time explain a little more in detail the letter of June 11, 1924, and particularly that portion thereof which directs the payment of the monthly rental of $500 to the Moyniers in the following proportions: To Marius Moynier, $247.18; to Abel Moynier, $120.82, and to Emile Moynier, $132. At the time the Moynier tract was subdivided into lots, and these lots conveyed in severalty to the three brothers, and at the date of the lease in question, each of these brothers was the owner of 34.73 acres of land in said tract. After the execution of said lease, and before the first extension thereof on May 19, 1922, Emile Moynier had sold lot 5, containing 16.19 acres, which left him only 18.54 acres, and Abel Moynier had sold lot 7, containing 17.76 acres, which left him only 16.97 acres. Lots 5 and 7, therefore, long prior to the execution of the supplemental agreement and the signing of the letter of June 11, 1924, had been entirely eliminated from the lease. The revenue stamps attached to the deeds conveying these lots indicate that Emile Moynier received $16,000 for lot 5, and that Abel Moynier received $18,000 for lot 7, and that they each retained these respective amounts of money so received as their own individual property. Therefore, when the supplemental agreement of

April 24, 1924, was executed and the letter of June 11, 1924, was signed, the lots subject to the lease were owned as follows: Lots 2, 9, and 10, containing 34.73 acres by Marius Moynier; lots 3, 4, and 8, containing 16.97 acres, by Abel Moynier, and lots 1 and 6, containing 18.54 acres, by Emile Moynier. The monthly rental of $500 by the letter of June 11, 1924, was made payable to the owners of said lots in proportion to their respective ownership in the lands leased, so that by the agreement between the three owners and their wives, as set forth in said letter, Marius Moynier received a monthly rental for his lands in the sum of $247.18; Abel Moynier for his lands the sum of $120.82, and Emile Moynier for his lands the sum of $132. The agreement, as embodied in the letter of June 11, 1924, clearly indicated that the original lease of the lands, if it were ever intended by the parties thereto that it should be a joint lease, in which the lessors should share equally in the rent and royalties thereunder, had become modified, at least to the extent of the rent, so that the owners of the leased land participated in said rent not equally and jointly, but unequally and in the proportion in which the lands which each lessor owned in severalty bore to the whole amount of the land embraced in the lease at the date of the letter of June 11, 1924. Nothing was said in this letter as to the disposition of the royalties which might accrue to the parties under the lease, but in the first extension agreement, being the agreement of date May 19, 1922, it was expressly provided that each well should be drilled wholly on one lot and the owner of said lot should be the only participant in oil from such well. The testimony of those who prepared the supplemental agreement of April 24, 1924, under which appellants claim that all prior extensions and amendments to the original lease, including the first extension agreement, were canceled, although not without conflict, was sufficient to support the finding of the court that appellants and respondents had entered into an agreement whereby it was agreed that respondents should receive all the royalties from said lot 9. There was other evidence in support of this finding in addition to that which we have already referred to, but we deem a detailed reference thereto to be unnecessary. It is sufficient to hold that there was sub-

stantial evidence before the trial court in support of the finding just mentioned to justify said finding.

■ This brings us to the consideration of the question as to whether the agreement between the parties was so uncertain upon the question of the payment of the royalties as to warrant the introduction of parol evidence to show how said royalties were to be participated in by the appellants and respondents. The original lease was silent as to the extent and as to the manner the lessors under the lease were to share in the royalties which might accrue to them thereunder. It did provide, however, that the lessee should continue drilling, in case oil was secured in paying quantities, until a total of ten wells were drilled; that lessee shall have the privilege of drilling one well on each respective property owned by the lessors; but that if a well were drilled on the division line of two of the owners it should be considered a community well and should constitute a fulfillment of the drilling obligation on both such parcels. The lease as originally drawn might be construed as a strictly joint lease (Civ. Code, sec. 1431; *Higgins* v. *California P. & A. Co.*, 109 Cal. 304 [41 Pac. 1087]). But in the first extension agreement the original lease was so modified as to provide that "Each well shall be drilled wholly on one lot, and the owner of that lot shall be the only participant in the royalty from such well." Just why this change was made in the terms of the original lease is not shown in the record. It does appear, however, that at that time Emile Moynier had sold lot 5 and Abel Moynier had sold lot 7, and thus reduced their ownership in the lands under the lease substantially to one-half of that which they each originally owned. The terms of the lease in this regard remained the same until the supplemental agreement of April 24, 1924, was executed. This was followed in a short time by the letter of June 11, 1924, wherein the appellants and respondents agreed among themselves that the rental should be divided between them in proportion to their ownership in the lands leased. No agreement, however, was made at this time regarding the royalty. Should the parties under the supplemental agreement go back to the original lease, under the terms of which, as contended by appellants, the royalties were to be divided equally between the three owners, or were they to continue under the lease

as modified by the first extension agreement, or were they to participate in the royalties in the same proportion in which they had agreed to share the rent? The answer to this question must rest upon the proper construction of the various agreements entered into by the parties. In the first place, it will be noted that the original lease had been expressly modified in two material respects aside from that contained in the first extension agreement, which appellants contend was superseded and canceled by the supplemental agreement. Since its execution the appellants, Emile and Abel Moynier, had each sold one of his lots covered by the lease, thereby reducing the amount of leased land which each of them owned to about one-half of that still owned by Marius Moynier. These lots so sold had been, by all of the parties to the lease, released from all of the terms thereof. Under these conditions were Emile and Abel still to share equally in all royalties received under the lease with Marius, who owned almost as much of the leased lands as Emile and Abel together owned? The other modification of the lease was made by the second extension agreement, and confirmed by the supplemental agreement of April 24, 1924. As confirmed by the latter agreement it gave to the owners of the leased land the right to sell any portion of the leased land, except for oil development, prior to the completion of a certain test well, which was known as the Casserini test well, and which was then being drilled in the near vicinity of the leased lands of the parties hereto, or prior to the commencement of drilling operations upon any of the leased lands. The supplemental agreement further provided, "if any land covered by this lease is so sold, then this lease, as to the portion so sold, shall become canceled and void, and a quitclaim shall be given the lessor releasing same from the operation of this lease, and the balance of the land shall still remain under the lease until sold or the Casserini test well be completed as above mentioned." Under this provision of the lease as it stood after the execution of the supplemental agreement the appellants could have sold any or all of the remaining portions of the leased land then belonging to them, and upon such sale the land so sold would, under the terms of the modified agreement, have been released from the terms of said lease, and the balance of the land would have still remained subject to the terms of the

lease. Had the appellants exercised this right and sold all their said lands, would they still be entitled, under the terms of the lease, to participate in the royalties which might thereafter have accrued under the lease equally with respondent, who would have owned all of the land then covered by the lease? The lease nowhere, either in its original or modified form or forms, furnished any answer to either of these two questions, without we accept appellants' contention that by the terms of the original lease the royalties were to be divided equally between the three Moyniers, and that in that respect the terms of the lease had never been changed, and, therefore, the appellants, notwithstanding the sale by them of all their lands covered by the lease, would still be entitled to participate in the royalties under the terms of the original lease, which they contend gave to each of the three owners of the land originally leased an equal share in the royalties. Such reasoning would lead to the most absurd results, and it is inconceivable that the parties to said agreement ever intended that any of them should share equally or at all in the royalties after having disposed of all his lands covered by the lease. The lease, as modified by the supplemental agreement of April 24, 1924, is clearly uncertain as to the disposition of the royalties to accrue thereunder. This uncertainty was caused entirely by the provisions of said supplemental agreement. Prior to its execution the terms of the agreement between the parties expressly provided that the owner of the lot upon which a well was drilled "shall be the only participant in the royalty from such well." Parol evidence was therefore admissible to explain this uncertainty, at least to the extent of showing the circumstances under which this supplemental agreement was made and entered into by the parties thereto (Code Civ. Proc., sec. 1860). "A court is not only to take a contract by all its corners, but is to be placed in the seats of the parties when it is made. In other words, a contract is to be construed in the light and with the knowledge of surrounding circumstances." (6 Cal. Jur., p. 294.) "The contract should, of course, be construed with respect to the situation in which the parties were at the time it was made." (*Burrows* v. *Petroleum Dev. Co.*, 181 Cal. 253, 256 [184 Pac. 5, 7].)

The action of the court in admitting parol evidence to explain the circumstances under which the supplemental agreement of April 24, 1924, was executed, was not erroneous. We have already considered this evidence and held that such evidence, considered with all the other evidence in the case, was sufficient to support the findings of the court in respondents' favor.

The court also admitted parol evidence to show that it was the intention of the parties under the original lease that the owner of the lot upon which a well was drilled should be the only one to participate in the royalty from said well. Appellants claim that the admission of such evidence was error. If so, the error was not prejudicial to any rights of the appellants, as the evidence which we have above referred to and reviewed shows without question that the original lease was modified by the subsequent agreements of the parties, so that it finally provided, if it did not do so in its original form, that each owner of a lot upon which a well was drilled should be entitled to all the royalty from said well.

For the reasons herein expressed the judgment is affirmed.

Preston, J., and Seawell, J., concurred.

Hearing in Bank denied.

All the Justices concurred.