[Civ. No. 1289. Fourth Appellate District.—April 10, 1934.]

JAMES CLARK et al., Respondents, v. ELSINORE OIL COMPANY (a Corporation), Appellant.

Strother P. Walton for Appellant.

W. H. Stammer for Respondents.

JENNINGS, J.—Plaintiffs instituted this action to recover from the defendant the sum of $1109.46 which the complaint alleged was paid to said defendant as trustee for plaintiffs on January 23, 1933. Trial of the action resulted in the rendition of a judgment in favor of plaintiffs for the amount demanded. The defendant thereupon prosecuted this appeal from said judgment. The record on appeal indicates that there is no controversy between the parties as to the essential facts which were developed by the evidence.

On May 3, 1929, plaintiffs were the owners as tenants in common of a certain tract of land in Kings County comprising approximately 40 acres. On the same date the defendant was the owner of another tract in said county which contained approximately the same acreage. The two tracts adjoined each other. On the aforesaid date plaintiffs and defendant as lessors joined in the execution of a lease of the two tracts to the Signal Oil and Gas Company, a corporation, as lessee. The contract of lease provided that the term should be 20 years "and so long thereafter as oil, petroleum, natural gas or kindred substances, or any one or more of them, shall be produced from said land". The express purpose of the lease was to enable the lessee "to explore for, discover, produce, extract, treat, refine, transport, sell and otherwise dispose of for its own use and benefit, all petroleum, natural gas and other hydrocarbon

substances, in, under and upon said tracts of land''. The contract further provided that the lessee should pay to the lessors as rent of the leased premises a royalty of one-eighth of the net proceeds derived by it from the sale of oil, gas, gasoline and other products manufactured and sold by the lessee from gas that might be produced from any well drilled on the land. The lessee obligated itself to commence drilling operations within a period of 18 months from the date of delivery to it of a certificate of title showing that the title to the land was as warranted by the lessors and to prosecute the drilling of such well for the production of petroleum in paying quantities with reasonable diligence. It further obligated itself to drill a total of eight wells on said land.

The lease contract contained two provisions which, as will appear, are of peculiar importance to the legal problem presented upon this appeal. The first of these provisions related to the division of royalties among the lessors and was as follows: ''It is understood and agreed that all of the lessors herein shall participate in the bonuses, rentals and royalties covering all of the demised premises in the proportion that their respective interests shall bear to the whole of said demised premises.'' The second provision expressly authorized the lessee at any time during the term of the lease to surrender and turn back to the lessors all or any part of the leased property and was in the following language:

''The lessee may at any time quitclaim to the lessors this lease in its entirety or as to part of the acreage covered hereby and thereupon lessee shall be released from all further obligations as to the part of the land so quitclaimed and all rentals and drilling obligations shall be reduced *pro rata* according to the acreage quitclaimed. All lands quitclaimed shall remain subject to easement for rights-of-way necessary or convenient for lessee's operations on land retained by it. Except as herein provided, full right to said land shall revest in lessors, free and clear of all claims of lessee, except that lessors, their successors or assigns, shall not drill any well on the said land within three hundred (300) feet of any producing well retained by lessee.''

On May 2, 1932, the parties to the original lease contract amended the same by providing that all payments to be

made by the lessee should be made "as to one half thereof to Elsinore Oil Company, and as to one-half to Elsinore Oil Company, Trustee". The provision relating to the participation in bonuses, rentals and royalties by the lessors was repeated in said amendment.

Subsequent to the execution of the original lease agreement the lessee entered into possession of the demised premises and pursuant to the terms of said agreement drilled an oil-well on that portion of said land which was owned by the defendant. This well was completed on July 12, 1932, and thereafter produced oil and gas in paying quantities. Thereupon, in accordance with the amendment to the lease of May 2, 1932, the lessee each month paid to the defendant the royalty provided for in the lease contract by delivering to the defendant two checks, one of which representing one-half of the royalty for the preceding month was drawn to the order of defendant and the second check representing one-half of said royalty was drawn to defendant as trustee. On December 10, 1932, the lessee executed a quitclaim deed "unto the person or parties legally entitled thereto" of all right, title and interest of said lessee in the demised premises expressly excepting therefrom 10 acres of land surrounding the oil-well which had been drilled by the lessee on defendant's land as aforesaid. On January 23, 1933, the defendant received from the lessee a check made payable to "Elsinore Oil Company, Trustee" in the amount of $1905.14. The above-stated amount represented one-half of the royalty for the month of December, 1932. From the proceeds of this check the defendant paid to plaintiffs the sum of $795.68 and retained the balance of $1109.46 for the recovery of which this action was instituted.

Appellant contends that the trial court erred in allowing recovery of the amount demanded. In support of this contention it is urged that the lessee was expressly permitted by the terms of the lease agreement to quitclaim all or any part of the demised premises and that when it did so respondents became vested with all right, title and interest in the tract of land owned by them and could deal with the land as they might choose. It is said that the land being fully released from the lease contract neither the lessee nor appellant has any claim of any character upon it.

It is further claimed that the drilling by the lessee of a producing oil-well on that portion of appellant's land which is still retained by the lessee has had the effect of making the land of respondents "proven" oil land so that respondents have been thus directly benefited by the drilling of the well on appellant's land and it is argued that to permit respondents to continue to share in the royalty paid by the lessee as rental for that portion of appellant's land which is still retained by the lessee after the restoration to respondents of the tract of land owned by them, especially since it has now become "proven" oil land is most unjust and unfair to appellant.

In connection with the above-stated argument it is said that in accordance with the decision in *Higgins* v. *California P. & A. Co.*, 109 Cal. 304 [41 Pac. 1087], respondents and appellant as lessors would have been entitled to an equal division of whatever royalties were paid for the use of the land by the lessee and that therefore the inclusion in the lease agreement of a clause specifically for an equal division of such royalties was entirely unnecessary and should be disregarded as pure surplusage.

The decision in *Higgins* v. *California P. & A. Co., supra,* is authority for the proposition that where the owners of distinct contiguous parcels of land enter into a joint lease of their properties such lease is valid, that the reservation of a specified monthly royalty for each ton of bituminous rock and liquid asphaltum that may be mined or removed from the leased premises as rent of such premises is unobjectionable and that although the agreement of lease contained no language providing for equal division of the royalty the terms of the lease warranted the presumption that each lessor was to receive one-half of such royalty, which presumption was in perfect accord with the practical construction of the lease by the parties thereto.

From the above recital it is apparent that if the lease agreement made by respondents and appellant on May 3, 1929, had contained no clause providing for equal division of whatever royalties might be received the above-cited case would, under the terms of said lease, have been authority for the proposition that the lessors were entitled to an equal division of such royalty. However, since the parties to the lease contract which is here considered chose to render

it certain that there was to be an equal division of whatever royalties might be received we fail to grasp the force of appellant's argument that no consideration should be given to this very plain provision. On the contrary, it would seem that the provision is of considerable importance and that we are not warranted in disregarding it. We entertain the opinion that the provision sheds light on the intention of the parties and particularly on the intention of the lessors and points to the fact that respondents and appellant intended to pool their holdings to the end that one or more oil-producing wells might be developed on their joint properties and that no matter at what location or on whose land such well or wells might be drilled whatever profit might result therefrom should be divided equally between appellant on the one hand and respondents on the other.

Since this was undoubtedly the intention of the lessors, it is entirely reasonable to presume that they intended that this equal division of any royalties that might be received should continue in the event that the lessee should surrender any portion of the demised premises covered by the joint lease. It is true that the lease agreement contains no language which specifically so provides. However, we find the reasoning of the decision in *Higgins* v. *California P. & A. Co., supra,* applicable to the problem here presented. In the Higgins case plaintiff and one Ashley, owners of adjoining lands on which there was a deposit of bituminous rock, had made a joint lease of their properties. Subsequently and during the term of the lease Ashley conveyed her land to the lessee. The evidence showed that no bituminous rock had ever been mined from that part of the deposit lying within plaintiff's land and that all rock mined under the lease had been mined on the Ashley property. For this reason the lessee contended that it was not obligated by the lease to pay any royalty to plaintiff on account of rock mined from that part of the deposit lying within the Ashley tract. This contention did not prevail, the court holding that if plaintiff and Ashley had been tenants in common of the demised premises, the effect of a conveyance by Ashley of her reversionary estate would have been to merge her interest in the leasehold term in the reversion and thereby to extinguish *pro tanto* the covenant of the lessee to pay rent to her, but that the plaintiff's right to continue to

receive the same rent which he had received prior to the conveyance would not have been affected and that no good reason appeared why the effect of Ashley's conveyance of her separate part of the demised premises, of which she was sole owner should not be substantially the same as it would have been if the lessors had been tenants in common of every part of such premises. The court further observed that if the lessors had been tenants in common, the plaintiff would still be entitled to a part of the rent proportionate to his undivided portion of the demised premises, but that since they were not tenants in common he was entitled, in the absence of an express or presumed agreement to the contrary, to a portion of the royalty proportionate to the comparative value of his distinct part of the demised property and that the terms of the lease warranted the presumption that each lessor was to receive one-half of the royalty, which presumption accorded perfectly with the practical construction of the lease by the parties thereto.

In the instant case if the respondents and appellant had been tenants in common of the demised premises appellant could not, with any hope of success, have advanced the contention that a surrender by the lessee to the lessors of all of the demised property except the 10 acres immediately surrounding the oil-well had the effect of extinguishing the right of respondents to receive any further share of the royalty paid by the lessee as rent for that portion of the land which was still retained by it. It is clear that respondents, under these circumstances, would still be entitled to a part of the rent proportionate to their undivided portion of the demised premises. Since the lessors were not tenants in common respondents were entitled, in the absence of an express or presumed agreement to the contrary, to that portion of the royalty which the lease contract expressly provided they were to receive, to wit: one-half. The fact that the lessee had elected to drill a well on that portion of the demised premises owned by appellant detracts nothing from the right of respondents to receive their proper share of the royalty. The terms of the lease agreement made the royalty payable to the lessors, not to the particular lessor on whose land a producing well might be drilled. When the lease contract was made the lessee had the right to drill a well on any portion of

the demised premises and except for its surrender of seven-eighths of such premises would not only have had the right, but would have been obligated to drill seven additional wells. The royalty of one-eighth of the net proceeds derived from any producing well or wells is simply a convenient and customary mode of estimating the rent to be paid for the exclusive occupation of the whole premises and the right to drill for oil at any place on such premises during the term of the lease.

Appellant places much reliance upon the decision in *Petroleum Midway Co., Ltd.,* v. *Moynier,* reported in 205 Cal., at page 733 [272 Pac. 740]. The facts upon which this decision rests are somewhat involved, but in the broad outline there is sufficient similarity to warrant appellant's reliance upon it as an authority directly in point. A close scrutiny of both the factual background and the legal principles announced by the decision is therefore justified.

The following synopsis of facts will suffice for the purposes of this opinion: A, B and C, who were brothers, were owners in common of a tract of land comprising something more than 100 acres. While they were such owners they subdivided the tract into 10 lots and became owners in severalty of such lots as follows: A became the owner of lots 2, 9, and 10, containing 34.73 acres; B became the owner of lots 1, 5, and 6, containing 34.73 acres; and C became the owner of lots 3, 4, 7, and 8, containing 34.73 acres. After they had thus become the owners in severalty of the respective lots, the three entered into a lease of the whole of said property on May 9, 1921. The lease was an oil lease and by its terms the lessee became obligated to pay to the lessors $2 per acre per month until drilling operations were begun and upon the discovery and production of oil a royalty of one-sixth of the oil produced. It was provided that the lessee should commence the work of constructing a drilling rig upon the land within one year from the time title to the land was satisfactorily shown to be in the lessors. On May 19, 1922, the time for the commencement of work was extended by a written agreement executed by the three lessors and the lessee. In this agreement it was provided that lots 5 and 7, which had been sold by their respective owners after the execution of the original lease, should be excluded from the operation of the lease. It was

further provided in this agreement that a clause of the original lease permitting a well to be drilled on the division line of any two lots in the tract should be abrogated and that each well to be drilled should be drilled wholly on one lot and that the owner of that lot should be the only participant in the royalty from such well. On March 31, 1923, a second agreement further extending the time for commencing work was executed by all the parties. This second extension agreement also provided that the monthly rental prior to the commencement of drilling operations should be $500 instead of $2 per acre and it was further provided that the lessors were authorized to sell any portion of the leased land, except for oil development, and in case of any such sale the land so sold should be excluded from the terms of the lease. On April 24, 1924, the lessors entered into a supplemental agreement whose terms were substantially the same as those of the second extension agreement except that it contained an additional paragraph which provided as follows: "Except as above, the said lease shall remain unchanged, and all previous extensions and amendments of said lease are superseded and canceled hereby." On June 11, 1924, the three lessors joined in a letter to the lessee which directed that payment of the monthly rental should be made direct to the respective lot owners, as follows: to A, $247.18; to B, $120.82; and to C, $132. This letter concluded with the statement that "except as herein modified, all the terms, covenants, and conditions of said lease and said supplemental agreement shall remain in full force and effect". Subsequently wells were drilled pursuant to the lease on lot 9, of which, as above noted, A was the owner. A controversy then arose between A, B and C, as to their rights to share in the royalties which were paid for the oil produced from these wells. The trial court held that A was the owner of lots 2, 9, and 10; that B and C had no interest therein; and that A alone was entitled to receive all royalties to be paid to the lessors under the original lease in so far as said lease affected said lots and that B and C were not entitled to any of said royalties and had no interest therein.

B and C appealed from the judgment of the trial court and on their appeal contended that the lease was a joint undertaking, that the rights of the lessors were joint and

not several, and that consequently each lessor was the owner of and entitled to receive an equal share of the royalties which might accrue under the lease.

In affirming the judgment of the trial court the Supreme Court held that the agreement between the lessors was so uncertain upon the question of the payment of royalties as to warrant the introduction of parol evidence to show how the lessors were to participate in such royalties and that the parol evidence relating to this subject which was submitted, together with all the other evidence in the case, was sufficient to support the findings of the trial court in A's favor. It was observed that the original lease had been expressly modified in two material respects. After its execution B and C had each sold one of the lots covered by the lease contract, thereby reducing the amount of leased land which each owned to approximately one-half of that owned by A. The lots so sold had been expressly released from the terms of the lease. This was the first modification. The second modification was made by the second extension agreement and confirmed by the supplemental agreement. As so confirmed it gave to the lessors the right to sell any portion of the leased premises, except for oil development, prior to the commencement of drilling operations. The supplemental agreement further specifically provided that if any land covered by the lease should be sold, the lease as to such portion so sold should become canceled and a quitclaim should be given the lessor releasing it from the operation of the lease, the balance of the land still to remain under the lease until sold or until the completion of a certain test well being drilled on other property. The two questions which were presented by reason of the aforesaid modifications were stated to be: (1) Under the conditions which prevailed were B and C to be permitted to share equally in all royalties with A, who owned almost as much land as B and C together owned? and (2) If B and C had exercised the right of sale as provided in the supplemental agreement and sold all land which they owned which was covered by the lease, would they still be entitled, under the lease, to participate in the royalties that might have accrued under the lease equally with A, who would then have been the sole owner of all land covered by the lease? It was said that the original

lease furnished no answer to either of these two questions and that the lease, as modified by the supplemental agreement, was so uncertain with respect to the disposition of royalties that might accrue as to justify the admission of parol evidence to explain the uncertainty, at least to the extent of showing the circumstances under which the supplemental agreement, which caused the uncertainty to exist, was entered into by the parties thereto.

It may well appear that it is entirely unnecessary and superfluous to point out the many material respects in which the factual background of the cited case differs from that which is here presented. Nevertheless, since appellant relies so strongly upon the decision in *Petroleum Midway Co., Ltd.,* v. *Moynier, supra,* this differentiation may properly be noted. In the first place, in the instant case there is no such modification as appeared in the Midway Petroleum case. It is true that the original lease was once amended, but the amendment expressly repeated the clause in the original lease, which provided that all lessors should participate in royalties in the proportion that their respective interests bore to the whole of the demised premises. The amendment then provided that all payments of royalties to be made by the lessee should be made as to one-half thereof to appellant and as to the remaining one-half to appellant as trustee and that upon making such payments in the manner designated the lessee should be relieved of all responsibility for the proper division thereof among the respective lessors. It is obvious that this amendment was made solely for the convenience of the lessee and that, so far as the question of the division of royalties between the lessors is concerned, it neither modified the terms of the original lease contract nor produced any uncertainty.

In the second place, there is no provision in the lease contract in the instant case which expressly permits the lessors to sell any portion of the land covered by the lease. The only provision which in any manner refers to such a possibility consists of a clause which merely provides that "no change in the ownership of the land hereby leased, or assignment of rentals or royalties shall be binding upon the lessee until after the lessee has been furnished with an original or duplicate original of the written transfer or assignment thereof".

In the third place, and more important, there is here no pretense that there was any sale or transfer of any portion of the demised premises by any lessor. In this respect, the facts of the instant case are entirely different from those of the Petroleum Midway Co. case.

In the fourth place, the release or surrender by the lessee of the entire acreage owned by respondents was accomplished by virtue of a provision of the lease contract which expressly permitted the lessee to do exactly this thing. This provision was one that was obviously inserted for the sole benefit of the lessee and its expressed object was to relieve the lessee from all further obligations with respect to the land surrendered.

In the fifth place, although the clause which permits the lessee at any time to quitclaim to the lessors all or any part of the demised premises provides that full right to such quitclaimed land shall revest in the lessors free and clear of all claims of the lessee, it is also expressly provided that such released land shall remain subject to easements for rights of way necessary or convenient for lessee's operations on land retained by it and that lessors, their successors or assigns, shall not drill any well on such released land within three hundred (300) feet of any producing well retained by lessee. It is clear, therefore, that the surrender of all land covered by the lease which was owned by respondents in pursuance of the above-mentioned clause of the lease did not operate to return to respondents that full and unqualified use of their land which they had enjoyed prior to the execution of the lease contract. Their land was returned to them, but it was returned burdened with certain restrictions. Evidence which was produced by respondents showed that after the execution of the quitclaim deed releasing respondents' land from the operation of the lease a pipeline which extended across respondents' land and which was utilized by the lessee for the conveyance of oil from the well to certain traps located on respondents' property was continued in use by the lessee and that traps and tanks located on respondents' land remained thereon and were used by the lessee and that a roadway which extended across a portion of respondents' property from the oil-well to the tanks near the eastern boundary of respondents' land continued in use. This evidence showed that at the time of trial, which

was more than three months subsequent to the execution by the lessee of the quitclaim deed, the pipe-line, the road, the traps and the tanks were being used by the lessee. It is apparent therefore that respondents did not become revested with the unqualified interest and estate in the land which they owned at the time the original lease was executed, but that their land was released to them burdened with certain definite easements which under the express provisions of the lease contract may continue in existence for the remainder of the term of the lease.

A further contention advanced by appellant deserves consideration. It is urged that the absence of a provision in the lease agreement definitely declaring that the lessors should continue to share royalties notwithstanding the surrender by the lessee of any of the demised premises is indicative of an intention of the parties that in the event of such surrender the clause providing for the equal division of royalties between the lessors should become inoperative. It is urged that a proper construction of the lease is determined not only by what is specifically declared therein, but also by what is expressly omitted therefrom on important features which are germane to the subject matter of the instrument and that the omission from the agreement of a clause expressly providing that the division of royalties should continue in the event of a surrender by the lessee of a part of the demised premises creates an irresistible inference that the parties to the agreement did not intend that the sharing of royalties should continue in the event of such surrender. In support of this contention appellant relies upon the decision in *First Nat. Bank* v. *Standard Oil Co.*, 91 Cal. App. 705 [267 Pac. 548, 549]. In the case cited the court was called upon to construe a lease agreement similar to that which is here being considered. The lease contract in the First National Bank case, however, contained two provisions which are not present in the lease in the present action. These were, first, a definite statement that the lessors agreed ''to pool their interest in this lease'' and, second, that a provision as to apportionment of benefits was to be operative ''notwithstanding the surrender by the lessee of any land described herein''. The appellate court held that the former provision regarding the pooling of interests indicated that the lessors had surrendered their

individual rights for the common good and that the second provision relative to the continuance of the apportionment of benefits notwithstanding a surrender was too plain and unambiguous to permit of a claim of uncertainty.

The above-cited decision is not authority for appellant's contention that the absence in the lease here considered of a provision for the continuance of equal division of royalties notwithstanding a surrender by the lessee of a portion of the demised premises justifies the drawing of an inference that the parties did not intend that the apportionment of benefits should continue if a surrender should occur. The cited case is not authority for the above-stated contention for the simple reason that the court had no occasion to discuss and did not discuss the absence of such a provision, since the lease contract there considered contained a clear, unambiguous and express statement that the apportionment of benefits should continue notwithstanding a surrender by the lessee of a part of the demised premises. In our opinion it was at least as reasonable for the trial court in the present action to infer that the absence in the lease of any provision that the division of royalties should be different in the event of a surrender by the lessee of part of the demised premises was indicative that the lessors who had embarked upon a joint enterprise intended that the apportionment of benefits should continue in the event of such surrender by the lessee. Evidently the trial court did so infer and since we entertain a definite opinion that such an inference was entirely reasonable we cannot declare that the inference was improper or unwarranted.

Appellant's final contention on this appeal is that the trial court erroneously admitted evidence regarding the circumstances which surrounded the making of the lease contract. The record shows that during the trial of the action and when appellant was presenting its defense the court, over respondents' objection, admitted in evidence the quitclaim deed which was executed by the lessee by which the lessee surrendered all of respondents' land and three-fourths of appellant's land. On rebuttal the respondents were permitted, over appellant's objection, to introduce evidence which tended to prove that prior to the execution of the lease respondents endeavored to make an independent lease of their separate property to the lessee, but were unable to do

so for the reason that the lessee insisted upon having a joint lease of the two tracts and that thereafter respondents and appellant executed the lease whose construction presents the problem to be determined by this litigation. This evidence was undoubtedly admitted on the theory that the lease contract was in some respects uncertain and that the trial court was entitled to be placed in the position of the parties and to be advised fully of the circumstances surrounding the execution of the instrument. If it be conceded for the sake of argument that appellant's contention relative to the admission of this evidence is sound and that the court erred in its admission, we entertain a settled conviction that no prejudice resulted to appellant therefrom and that the claimed error was harmless. We entertain this opinion for the reason that we think that the very language and terms of the lease show that the instrument was a joint lease whereby respondents as owners of one 40-acre tract and appellant as the owner of an adjoining 40-acre tract pooled their lands for the common benefit of both lessors. We think therefore that the admission of the evidence to which objection was made did no more than emphasize the fact that the lease contract was a joint adventure so far as the lessors were concerned and that no different result could have been reached if appellant's objection had prevailed and admission of the evidence had been refused.

For the reasons stated, the judgment is affirmed.

Barnard, P. J., and Marks, J., concurred.