[No. D005277. Fourth Dist., Div. One. Dec. 9, 1987.]

KENNECOTT CORPORATION, Plaintiff and Respondent, v. UNION OIL COMPANY OF CALIFORNIA et al., Defendants and Appellants.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of sections V and VI.

1180

**COUNSEL**

Gray, Cary, Ames & Frye, Jay W. Jeffcoat, Merrill F. Storms, Jr., MacDonald, Halsted & Laybourne, Dennis Keeley, Thomas S. Kidde, Michael Lee McQueen and Mark C. Allen III for Defendants and Appellants.

Jones, Day, Reavis & Pogue, Allyn O. Kreps, Joanne M. Frasca, Scott D. Bertzyk, Pinney & Caldwell and Michael A. Ralston for Plaintiff and Respondent.

OPINION

BUTLER, J.—The Imperial Irrigation District (IID) owns land in the Imperial Valley underlying which are mineral deposits and geothermal formations capable of producing steam convertible into electric energy. IID as lessor leased 280 acres of such land to a lessee for production of steam and minerals. The lessee assigned the leasehold interest to Imperial Thermal Products (ITP). ITP then assigned to Southern Pacific Land Company (Southern) its rights to produce steam from the land and to dispose of the wastes from such production. Southern later assigned those rights such that Union Oil Company (Union), Mono Power Company (Mono) and Southern eventually became the owners of undivided one-third interests in the steam. While ITP was producing steam and minerals under the original lease, the waste residues were deposited into brine ponds. The cost of disposing of the wastes in these brine ponds as required by water quality control agencies and liability for such costs prompted Union, Southern and Mono to surrender to ITP their interests. ITP averred the surrender was ineffective. Union and its fellow owners considered the surrender divested them of their interests in the land. Three years later, a federal court adjudicated ITP solely responsible to pay those costs. Union, Southern and Mono then decided the surrender was indeed ineffective and reasserted claims to the lease. Kennecott Corporation (Kennecott), ITP's successor, sued to quiet title to the leasehold free and clear of those reasserted interests. The court granted Kennecott's motion for summary judgment, adjudicating that the surrender effectively eliminated any interests held by Union, Southern or Mono. We affirm.

I

In 1961, the Imperial Irrigation District as lessor leased 280 acres of land to Joseph I. O'Neill, Jr., and Ashmun and Hilliard, a partnership (the O'Neill Group) as lessees for the purpose of drilling for, extracting and processing "all steam and thermal energy" as well as minerals and chemical elements whether solid, liquid or gas. The lease was for the term of 10 years and thereafter so long as steam or minerals were produced in commercial quantities but not longer than 99 years. The lease provided in paragraph 22(b): "Lessee shall have the right at any time prior to or after default hereunder, upon payment of the sum of One Hundred Dollars ($100.00) to Lessor, to quitclaim and surrender to Lessor all right, title and interest of Lessee in and to the Leased Lands or to any parcel or parcels thereof containing 40 acres or any multiple thereof; and thereupon all rights and obligations of the parties hereto one to the other shall cease and terminate as to the Leased Lands or such parcel or parcels thereof so quitclaimed and surrendered, save and except as to accrued royalty obligations of Lessee then payable, or damage to persons or property resulting from operations of

Lessee on, in or under the Leased Lands or such parcel or parcels thereof so quitclaimed and surrendered, and save and except for the provisions of Sections 4, 5 and 7 of this Lease, as to which Lessee shall remain liable to Lessor."[2]

The O'Neill Group and Shell Oil Company conducted geothermal operations on the land. To prevent brine waste residues from flowing into the Salton Sea, they built ponds to capture the brine generated from their operations. The O'Neill Group as lessees assigned to ITP its leasehold interest in 1966. ITP operated the existing wells on the land to 1972 and then assigned to Southern all of its "right, title and interest . . . in said leased premises in and to all steam and thermal energy" produced from the land. We refer to the document assigning this interest in the lease as "the assignment." The right to extract minerals was excluded. The assignment gave Southern the right upon 60 days notice to IID, ITP and other royalty holders: "to surrender the leased premises, or any portion or portions thereof to Imperial Thermal. Subject to the provisions of Section 9, upon expiration of said sixty (60) day period, Southern shall surrender and assign to Imperial Thermal and Imperial Thermal shall accept the right and interest of Southern in the leased premises, or portion or portions thereof, as the case may be, to be so surrendered. Upon surrender of such right and interest, Southern shall be relieved of, and Imperial Thermal shall assume, all obligations thereafter arising under the Lease, as amended pursuant to paragraphs (a) and (b) of Section 14, said Assignment of Overriding Royalty Interest dated December 20, 1961 and the Cypher Agreement, with respect to said surrendered right and interest."[3]

January 30, 1973, Southern assigned a one-third undivided interest to Mono giving Mono the right to surrender in whole or in part the one-third undivided interest upon 90 days notice with the option to Southern to reacquire the one-third from Mono. Upon the surrender, Mono is relieved of all obligations. The parties stipulated Phillips Petroleum Company (Phillips) acquired from Southern an undivided one-third interest. This assignment is not in the record.

In 1976, the California Regional Water Quality Control Board (Board) found ITP in violation of regulations for maintenance of the brine ponds and ordered construction of facilities permanently to protect discharge of brine into the Salton Sea or to remove and relocate the brine waste residue to approved locations. ITP, Southern, Mono and Phillips agreed to share equally the cost of the corrective work up to $50,000. In December 1976,

---

[2] Sections 4, 5 and 7 of the lease concern matters not relevant to issues on this appeal.

[3] Section 9, section 14(a) and (b) and the other documents referred to in this part of the lease are not relevant to the issues on appeal.

Phillips assigned its one-third undivided interest to Southern and ITP, one-sixth each. In 1978, through assignments of interests, Union became the holder of a 50 percent interest as lessee in the leased land and Mono and Southern each then held an undivided 25 percent. Union was designated operator of the leased land and by May 1981, completed drilling two geo-thermal wells and performed maintenance on the brine ponds.

In August of 1980, ITP agreed to sell to Bear Creek Mining Company (Bear Creek) all of its lessee interest in the lease and its rights under the assignment made by ITP to Southern as well as other mineral and geother-mal rights in other lands subject to liability except for the brine ponds. ITP was required under the sale agreement to indemnify Bear Creek from brine pond liabilities.

In May of 1981, the pot began to boil. The Board scheduled a May 20, 1981, public hearing concerning cleanup of the brine ponds. Union, South-ern and Mono decided to surrender their interests to ITP to avoid potential cleanup liability. May 12, 1981, the Board submitted a proposed order finding ITP, Union, Southern and Mono to be dischargers of brine into the ponds. The ponds contain hazardous materials. The Salton Sea laps at the foot of the pond dikes, and the ponds contain some 262,000 tons of salt. The Board proposed prohibiting further discharge into the ponds and use of the ponds for waste storage, requiring removal of waste and setting time limits for removal of the salt. The next day, May 13, 1981, Union, on behalf of itself and Southern and Mono, gave notice of intention to surrender their interests in the leased premises: "Pursuant to Paragraph 8 of said Assign-ment and Agreement dated September 7, 1972, Union Oil Company of California, Southern Pacific Land Company and Mono Power Company hereby notify you of their intent to surrender the following portion of the leased premises to Imperial Thermal Products, Inc. effective as specified in said Assignment and Agreement:

"*Township 11 South, Range 13 East, SBM* Section 14: N/2, SE/4, SW/4, SE/4; and Section 23: NW/4." May 20, 1981, the Board issued its perma-nent order identical to the proposed order. June 9, 1981, ITP acknowledged receipt of the surrender notice advising Union ITP "rejects this attempted release and will treat any effort to consummate such a release as being null and void."[4] June 17, 1981, Union as operator petitioned the Board for

---

[4] To remind the reader, paragraph 8 of the 1972 ITP-Southern assignment gives the right upon 60 days notice to Southern to surrender and assign any portion of the leased premises and "upon [such] surrender . . . Southern shall be relieved of, and [ITP] shall assume, all obligations thereafter arising under the Lease . . . with respect to said surrendered right and interest."

review of its order to eliminate Union, Southern and Mono as dischargers liable for waste removal costs. ITP responded asking Union's petition be dismissed, claiming the Board had no power to adjudicate the responsibilities of the parties for cost of waste removal.

July 13, 1981, 60 days after notice of intent so to do, Union, Southern and Mono, consistent with procedural requirements under the assignment, recorded a surrender of the lands covered by the assignment. August 6, 1981, ITP wrote to Union the surrender was deemed to be ineffective, Union, Southern and Mono were responsible for the brine ponds and the surrender was rejected. ITP assigned to Bear Creek all of its interests in the leased premises and Bear Creek merged with Kennecott in 1982.

ITP brought the long-simmering dispute over the brine ponds to the courts in April 1983 by filing a complaint for declaratory relief in the United States District Court for the Central District of California seeking a declaration that Union, Southern and Mono were responsible in whole or in part for the cost of the brine pond cleanup estimated at $6 million. ITP earlier cleaned the ponds responsive to a Board order. The defendants answered; both sides asked for summary judgment. ITP lost. May 25, 1984, the court held ITP solely responsible for the cleanup expense incurred responsive to the Board's order. Some jawboning occurred between Union and Kennecott people concerning Union's continuing interest in the surrendered lease following the declaratory relief action. November 26, 1984, Union articulated its position in a letter to the State Lands Commission. The letter notes the 1972 agreement between ITP and Southern bifurcated subsurface interests; ITP retained mineral rights; Southern acquired geothermal rights; the brine ponds were the residue of mineral development; thus, the federal court properly held ITP responsible for the cleanup; Southern, Union and Mono had no right to or interest in mineral development. Union asserted ITP's rejection of the surrender effectively retained lease interests in them. Responding, Kennecott then filed its complaint to quiet title and for declaratory relief and asked the court to adjudicate Kennecott the sole owner of the leased premises free and clear of any claim of Union, Southern or Mono. Kennecott recorded January 10, 1985, a repudiation of rejection of partial surrender of lease asserting ITP's mistaken belief Union, Southern and Mono continued to have duties under the lease and the rejection of attempted surrender was wholly ineffective. The court granted Kennecott's motion for summary judgment and denied cross-motions for summary judgment of Union, Southern and Mono. They appeal. We affirm.

## II

The parties stipulated there is no triable issue of material fact and the case should be adjudicated by the court one way or the other by way of

summary judgment. Alternatively, they agreed their stipulation of facts could be deemed an adjudication of issues without substantial controversy and deemed established at trial. We have taken our statement of facts from the stipulation and agree with Union, Southern and Mono (collectively, for ease of reference, hereinafter Union) the sole issue on appeal is whether these undisputed facts established, as a matter of law, Union surrendered the leasehold estate to ITP.

III[5]

Union's interest acquired under the assignment is a *profit à prendre*. "The owner of land has the exclusive right on his land to drill for and produce oil. This right inhering in the owner by virtue of his title to the land is a valuable right which he may transfer. The right when granted is a profit *à prendre,* a right to remove a part of the substance of the land. A profit *à prendre* is an interest in real property in the nature of an incorporeal hereditament." (*Dabney-Johnston Oil Corp.* v. *Walden* (1935) 4 Cal.2d 637, 649 [52 P.2d 237].)

A *profit à prendre* has been defined as the "right to make some use of the soil of another, such as a right to mine metals, and it carries with it the right of entry and the right to remove and take from the land the designated products or profit and also includes right to use such of the surface as is necessary and convenient for exercise of the profit." (Black's Law Dict. (5th ed. 1979) p. 1090, citing *Costa Mesa Union Sch. Dist.* v. *Security First Nat. Bk.* (1967) 254 Cal.App.2d 4 [62 Cal.Rptr. 113]; see 3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 544, pp. 2216-2217; *Dabney* v. *Edwards* (1935) 5 Cal.2d 1, 11 [53 P.2d 962, 103 A.L.R. 822]; *Callahan* v. *Martin* (1935) 3 Cal.2d 110, 118 [43 P.2d 788, 101 A.L.R. 871]; *Gerhard* v. *Stephens* (1968) 68 Cal.2d 864, 878, fn. 7 [69 Cal.Rptr. 612, 442 P.2d 692] [profits are incorporeal hereditaments which automatically extinguish when surrendered and return to the estate out of which they were carved].)

The rules governing surrender and abandonment of possessory leaseholds are expressly *inapplicable* to a *profit à prendre*. Civil Code section 1952.4 provides: "An agreement for the exploration for or the removal of natural resources is not a lease of real property within the meaning of Sections 1951 to 1952.2, inclusive" (which govern the rights and obligations of landlords and tenants with respect to termination, surrender and abandonment). The Law Revision Commission comment to section 1952.4 further states: "An agreement for the exploration for or the removal of natural resources, such as the so-called oil and gas lease, has been characterized by

---

[5] We acknowledge sections III and IV repeat and paraphrase parts of Kennecott's opening brief.

the California Supreme Court as a *profit à prendre* in gross. [Citation.] These agreements are distinguishable from leases generally. . . ."

This distinction derives from the nature of a mineral lease which normally requires the lessee to pay the lessor either a minimum royalty or a percentage of production for each acre of property subject to the profit. Since the lessee remains obligated to pay minimum royalties for so long as it holds an interest in the property (which typically is for an indefinite term), most mineral leases include a surrender clause which enables the lessee *unilaterally* to quitclaim its interest, and thereby avoid paying any further royalties on land that proves to be unproductive.[6]

The genesis of this unilateral surrender right is obvious: if acceptance were required for surrender of a profit interest to be effective, in the normal course a lessor always would withhold acceptance in order to continue receiving minimum royalty payments on unproductive property which would be difficult, if not impossible, to relet.

Our courts consistently have recognized that the right to surrender a profit interest is a *unilateral* right vested in the lessee.[7] ■ Indeed, one California court commented: "[a mineral lease] is not analagous [*sic*] to a lease in the ordinary sense, *but to an option; that is to say that it is so far unilateral that it could be at any time terminated by the lessees . . . ."* (*Scheel* v. *Harr* (1938) 27 Cal.App.2d 345, 352 [80 P.2d 1035], italics added.)

■ A profit interest in geothermal resources is not an ordinary leasehold interest at all. Rather, it is a means by which a party may explore for

---

[6](See, e.g., *Pimentel* v. *The Hall-Baker Co.* (1939) 32 Cal.App.2d 697, 700 [90 P.2d 588] [the lease "contained the usual quitclaim clause permitting the lessee to quitclaim all or any portion of the leased property to the lessor and thereby be released from all or a proportionate part of its drilling obligations, depending on the amount of land quitclaimed"]; *La Laguna Ranch Co.* v. *Dodge* (1941) 18 Cal.2d 132, 140 [114 P.2d 351, 135 A.L.R. 546] ["Ordinarily, however, such oil and gas leases contain clauses permitting the lessee to cease operations and to surrender the lease if he no longer considers it possible to continue operations profitably"]; see also, *La Laguna, supra,* at p. 145, Carter, J., dis. ["It must be remembered that as between the lessor and lessees the right to terminate the lease is a right pertaining solely to the lessees. It is an option they may exercise without regard to the lessor's desires"]; see also *George* v. *Weston* (1938) 26 Cal.App.2d 256, 262-263 [79 P.2d 110]; *Clark* v. *Elsinore Oil Co.* (1934) 138 Cal.App. 6, 17 [31 P.2d 476]; *Sheehan* v. *Vedder* (1930) 108 Cal.App. 419, 428 [292 P. 175]; 47 Cal.Jur.3d (3d ed. 1979) Oil and Gas, § 126, pp. 531-532.)

[7]Because the right to surrender may be exercised unilaterally by the lessee regardless of the consent of the lessor, California courts have held that a lease containing such a clause lacks mutuality of obligations and *cannot* be specifically enforced by the lessee. (See, e.g., *Sturgis* v. *Galindo* (1881) 59 Cal. 28; *Pimentel* v. *The Hall-Baker Co., supra,* 32 Cal.App.2d 697, 701-702.) Thus, Union's argument that ITP's wrongful refusal to accept the surrender gave them a claim for specific performance under the 1972 assignment is patently incorrect.

and extract resources until it chooses in its sole discretion to surrender its right to do so. Upon the unilateral exercise of that surrender right, the geothermal interest automatically extinguishes and merges into the estate out of which it was carved. (*La Laguna Ranch Co.* v. *Dodge, supra,* 18 Cal.2d 132, 140 ["the surrender of the leasehold interest by the lessees constituted a termination of the *profit à prendre* and the leasehold"].)

 As Union's interests in the 280 acres automatically were extinguished upon recordation of the surrender, there simply was nothing for ITP to accept or to reject. Union's reliance upon authority requiring acceptance of a physical abandonment of a possessory leasehold estate is misplaced.

 It is well established that if the lessee surrenders a lease by the method set forth in a surrender clause, the surrender is effective without any additional consent of the lessor, unless the surrender clause specifically states otherwise. In *Title Ins. etc. Co.* v. *Amalgamated Oil Co.* (1923) 63 Cal.App. 29, 33 [218 P. 71], the lessee deposited in the lessor's mailbox a quitclaim deed and the $10 required by the surrender clause of the lease, but the lessor "never accepted said tender or deed." Nevertheless, the court found there had been an effective surrender: "It is not seriously contended by the appellant that these acts of the defendant did not work a forfeiture of the lease. We are of the opinion that they did, and that the lease became forfeited at the time of the deposit of said sum of ten dollars for the lessor." (*Id.* at p. 34.)

Similarly, in *Superior Oil Co.* v. *Dabney* (1948) 147 Tex. 51 [211 S.W.2d 563], the oil, gas and mineral lease provided: "'Lessee may at any time execute and deliver to Lessor or to the depository above named or place of record a release or releases covering any portion of [*sic*] portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered.'" (At p. 563.) In *Superior Oil,* the lessee subsequently delivered a release to the lessors which surrendered all portions of the leased premises except for an 18-acre parcel. The release contained blank spaces for signature by the lessors which the lessors declined to sign. In a letter to the lessee dated one month after the date of the release, the lessors rejected the purported surrender and took the position the lessee was under a positive and unequivocal obligation to begin drilling on the leased premises.

Despite the lessors' actions, the court found there had been a valid surrender: "The release of July 12, 1946 was properly executed by the lessee and tendered to the lessors. Spaces for the signature of the lessors were provided at the end of the instrument. As has been stated, the lessors

declined to sign. These circumstances do not at all deprive the instrument of its effectiveness as a release. All that was required under the wording of the lease was that the lessee execute and deliver a release to the lessors. This was done, and thereupon the release became fully effective." (*Superior Oil, supra,* at p. 566.)

▮ Here, Union claims ownership based upon ITP's recordation of the rejection, arguing this constitutes a refusal to accept the surrender. However, paragraph 8 of the 1972 assignment provides that the right to surrender is unqualified, and that upon its exercise, ITP "*shall accept* the right and interest . . . so surrendered." (Italics added.) Therefore, ITP had no election to reject the surrender under the 1972 assignment and the trial court so held. Indeed, this was precisely Union's position in the federal court action following execution of the surrender. "Our position was that ITP did not have the right to reject. They had a contractual obligation to accept. And therefore our position was that . . . we had attempted a valid and proper surrender."[8]

## IV

Even if paragraph 8 of the 1972 assignment is ambiguous as to whether an affirmative act of acceptance by ITP is required for the surrender to be effective, rules of contract interpretation lead to the conclusion the parties did not so construe the assignment.

▮ Civil Code section 1636 provides that a contract must be interpreted to give effect to the intentions of the parties at the time of contracting. The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions. (See, e.g., *United California Bank* v. *Maltzman* (1974) 44 Cal.App.3d 41, 49 [118 Cal.Rptr. 299]; *Spott Electrical Co.* v. *Industrial Indem. Co.* (1973) 30 Cal.App.3d 797, 808 [106 Cal.Rptr. 710]; *Salton Bay Marina, Inc.* v. *Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 936 [218 Cal.Rptr. 839] [A court "is required to give 'great weight' to the

---

[8] We do not construe this language in paragraph 8 to require an affirmative act of acceptance by ITP for the surrender to be effective. The sentence "Southern shall surrender . . . and Imperial Thermal shall accept the right and interest . . . so surrendered," as used in paragraph 8, simply indicates that, upon the surrender of any or all of the leased premises, ITP has no discretion to do anything other than take back the property so surrendered. Since there is no ambiguity in this language, the plain meaning of those words must be given effect. (Civ. Code, § 1638; see *Blue Cross of Northern California* v. *Cory* (1981) 120 Cal.App.3d 723, 734 [174 Cal.Rptr. 901] ["A contractual obligation defined by the imperative auxiliary 'shall' is ordinarily understood to be mandatory and unconditional"].) The surrender, as a matter of law, terminated the *profit à prendre* and there was nothing to accept or to reject.

conduct of the parties in interpreting the instrument before any controversy arose"].)

██ The conduct by Union following recordation of the surrender through late 1984 permits only one interpretation of paragraph 8 of the 1972 assignment—that no affirmative act of acceptance on the part of ITP was intended by the parties to be necessary for the surrender to be effective. For three years after recordation of the surrender, Union consistently asserted to ITP, IID and Kennecott that the surrender was effective, that ITP had no right to reject the surrender, and that ITP's purported rejection was ineffective. Further, since recordation of the surrender, Union has made no use of the 280 acres for any purpose and, until recently, failed to object to any of Kennecott's numerous assertions of ownership or exploration activities undertaken in reliance on its belief of ownership. Even ITP, which executed the rejection, did not contend that its affirmative acceptance was necessary for a surrender to be effective. Rather, as indicated in ITP's August 6, 1981, transmittal letter to Union enclosing a copy of the rejection, ITP recorded the rejection solely because Union, Southern and Mono "are responsible for the ponds located on the Property, and they cannot evade this responsibility by the purported 'partial surrender.'"

Finally, any other interpretation would render the purpose of paragraph 8 of the 1972 assignment virtually meaningless as the lessor at any time could withhold an affirmative act of acceptance, thereby defeating the right to surrender such property back. Civil Code section 1641, which provides that each clause of a contract is to be given effect, if possible, rules out such an interpretation that effectively would nullify the surrender provision of the 1972 assignment.

## V, VI*

## VII

Union admits relinquishment of the 280 acres when it appeared to carry substantial liability. Now that the storm has subsided and the sea is calm, Union seeks to sail the sea even though it canceled its ticket. While "heads I win, tails you lose" may be useful in Las Vegas, we decline to let Union play that game.

*See footnote 1, *ante,* page 1179.

Judgment affirmed.

Kremer, P. J., and Huffman, J.,* concurred.

---

* Assigned by the Chairperson of the Judicial Council.