[No. B200959. Second Dist., Div. Three. Apr. 3, 2008.]

EMPLOYERS REINSURANCE COMPANY et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THORPE INSULATION COMPANY, Real Party in Interest.

## COUNSEL

Simpson Thacher & Bartlett, Barry R. Ostrager, Deborah Lynn Stein, Robert Pfister; Craig & Winkelman and Bruce H. Winkelman for Petitioner Employers Reinsurance Company.

Grippo & Elden, Todd C. Jacobs, John E. Bucheit; Carroll Burdick & McDonough, Sarah M. Shields and Robert A. Binion for Petitioner Transcontinental Insurance Company.

Kaufman & Logan, Peter J. Logan, Emme Thompson, Randall P. Berdan; Lind, Jensen, Sullivan & Peterson, Ted E. Sullivan, Thomas D. Jensen, Laurie Meyer; Crowell & Moring and Steven P. Rice for Petitioner Chicago Insurance Company.

Nixon Peabody, John H. Riddle, Robert P. Kavanaugh and Alan S. Feiler for Petitioner Maine Bonding and Casualty Company.

Selman Breitman, Holly Burgess and Jeffrey C. Segal for Petitioner Middlesex Insurance Company.

Harrington, Foxx, Dubrow & Canter, Kevin P. McNamara; Traub, Eglin, Lieberman Strauss and Meryl R. Lieberman for Petitioner Associated International Insurance Company.

O'Melveny & Myers, Richard B. Goetz, Steven H. Bergman; Berman & Aiwasian and Alan S. Berman for Petitioners Motor Vehicle Casualty Company and Central National Insurance Company of Omaha.

Litchfield Cavo, Edward D. Vaisbort and G. David Rubin for Petitioner Argonaut Insurance Company.

Tressler, Soderstrom, Maloney & Priess, Katherine K. Liner and Adam C. Hackett for Petitioner Allstate Insurance Company.

Gordon & Rees, Matthew S. Foy and Arthur Schwartz for Petitioners Granite State Insurance Company and National Union Fire Insurance Company of Pittsburgh, PA.

Frederick Bennett for Respondent.

Morgan, Lewis & Bockius, Michel Y. Horton, Charles J. Malaret, Martina Bernstein and Thomas M. Peterson for Real Party in Interest.

OPINION

**CROSKEY, J.**—In this case, we consider the use of "course of performance" evidence in the interpretation of contracts of insurance and conclude that such evidence is relevant and may be used for such purpose. However, such evidence is only admissible when the performance was pursuant to the contract to be interpreted, not a subsequent settlement agreement such as the one we have in this case.

Thorpe Insulation Company (Thorpe), a distributor and installer of asbestos insulation products, was sued in numerous personal injury actions. Thorpe had many insurance policies, both primary and excess, issued by different insurance companies (the insurers).[1] Thorpe tendered the asbestos claims to the insurers, and there followed some 30 years of negotiations, settlement agreements, claims handling agreements, reservations of rights, and payments of defense costs and indemnity, resulting in the exhaustion or near exhaustion of Thorpe's $180 million in insurance coverage. Nearly all of Thorpe's insurance policies provided coverage for both "products" (or "completed operations") claims and "non-products" (or "operations") claims.[2] The individual policies' aggregate limits of liability apply to products claims but not

---

[1] The insurance companies that are parties to this writ proceeding are: Employers Reinsurance Company; Westport Insurance Company; Transcontinental Insurance Company; Maine Bonding and Casualty Company; Allstate Insurance Company, solely as successor in interest to Northbrook Excess and Surplus Insurance Company, formerly Northbrook Insurance Company; Argonaut Insurance Company; Middlesex Mutual Insurance Company; Associated International Insurance Company; Chicago Insurance Company; Central National Insurance Company of Omaha; Motor Vehicle Casualty Company; Granite State Insurance Company; and National Union Fire Insurance Company of Pittsburgh, PA.

[2] A manufacturer or service provider can incur liability both while work is in progress and after completion. Claims for injuries arising while an activity is in progress fall within "non-products" or "operations" coverage. Claims for injuries arising once the product has been completed and sent to market fall within "products" or "completed operations" coverage. The coverages are complementary and not overlapping. Products coverage takes over where operations coverage leaves off. (*Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 500–501 [20 Cal.Rptr.2d 376].)

non-products claims. In other words, non-products claims would not exhaust a policy. When the insurers paid Thorpe's claims, they charged the payments against policy limits, treating all of the asbestos suits as products claims. When its policies were nearly exhausted, and asbestos suits continued to be filed against Thorpe, Thorpe brought the instant suit against its insurers, seeking declaratory relief that at least some of the current and future asbestos suits against it should be considered non-products claims.[3]

The insurers took the position that, over the past 30 years, the parties had all assumed that asbestos claims were products claims which exhausted aggregate limits, and that, in fact, Thorpe had obtained millions of dollars in payments from its excess insurers based on this very assumption. Thorpe sought and obtained summary adjudication of the insurers' affirmative defenses of waiver, estoppel, laches, and ratification. That ruling is not at issue in this writ proceeding. Thorpe also moved, in limine, to preclude the insurers from introducing the parties' 30-year course of handling the asbestos claims as evidence of the *meaning* of the insurance policies. The trial court granted the motion, and the insurers sought writ review. We issued an order to show cause,[4] and now grant the petition in part.

## FACTUAL AND PROCEDURAL BACKGROUND

According to the operative complaint, Thorpe "is a California company that installed, repaired, maintained, removed and displaced asbestos materials at industrial facilities. It has been subject to thousands of asbestos bodily injury lawsuits resulting from these historical operations." In the asbestos suits, the underlying plaintiffs "seek . . . recovery of damages from Thorpe resulting from their alleged injurious exposure to asbestos at industrial facilities serviced by Thorpe. The [underlying] plaintiffs seek recovery against Thorpe on various theories of recovery, including premises liability, negligence, and failure to warn." In 1978, Thorpe began submitting asbestos claims to its primary insurers.

In 1984, Thorpe and 10 of its primary insurers entered into a claims handling and settlement agreement (the 1984 Agreement). The stated purpose of the 1984 Agreement was to "clarify among" the parties to the agreement the "apportionment of defense and indemnification of Thorpe . . . under any of the carriers' policies arising out of numerous lawsuits charging Thorpe with liability for damages to individuals resulting from exposure to asbestos

---

[3] Moreover, Thorpe sought a declaration that the insurers had the burden to prove that any underlying claim was a products claim that was subject to their policies' aggregate limits.

[4] This proceeding was temporarily stayed following Thorpe's filing a petition in bankruptcy. The insurers have obtained an order from the bankruptcy court permitting this writ petition to proceed.

products." The 1984 Agreement states that it "is the result of a compromise accord and is a compromise settlement of disputed claims. It is the product of arms length negotiations, is not intended to nor shall it be construed as the admission of the existence of a policy or as a policy interpretation, and shall not be used in any Court or Arbitration to create, prove or interpret the obligations under general liability or other liability policies." It further stated that "[i]t is the purpose of this Agreement to achieve, between Thorpe and its insurers, the most efficient and economical defense of Thorpe in such asbestos cases without prejudice to later assertion by any of such parties of claims against each other, or against third persons, pursuant to the several reservations of rights . . . contained in this Agreement." The agreement allocated the costs of defense and indemnification among the insurers. It then provided, "Upon payment of policy limits or aggregate limits by any insurer that is a party to this Agreement, . . . Thorpe shall assume that particular insurer's obligation under this Agreement," with an express reservation of rights against any excess carrier or other primary carrier. The parties reserved all rights against each other, in the event it is ultimately determined by California case law or statute that the responsibility of insurers in asbestos cases shall be "determined on the manifestation, as distinguished from the exposure theory, or any other theory substantially different from the allocation theory of this Agreement."[5] It appears that the 1984 Agreement was intended to be final with respect to the parties to the agreement, except in the event of a change in law. Finally, the 1984 Agreement provided that, except as expressly modified, "all terms and conditions of all policies written by the insurers for Thorpe remain in effect without alter[]ation by this Agreement."

The parties operated under the 1984 Agreement, with the primary insurers charging the asbestos claim costs against their aggregate policy limits. In other words, all of the asbestos claims were treated as products claims that exhausted the policies. As the primary policies were exhausted, Thorpe turned to its first layer of excess insurers for coverage.

In 1998, seven of Thorpe's first level excess carriers entered into an interim excess insurance claims handling agreement (the 1998 Agreement). The excess carriers' execution of the 1998 Agreement was intended "to adopt by way of compromise and accord without prejudice or waiver of their respective positions in this and other matters, an interim mechanism for allocating the responsibility for Defense Costs and Indemnity Payments." Under the 1998 Agreement, each signatory excess insurer "expressly reserve[d] any rights and defenses that it may have against any person or entity that is or is not a Party to this Agreement with respect to any asbestos-related

---

[5] The "any other theory" language appears to relate only to theories of allocation. The parties do not suggest that the "any other theory" language could, or should, be read to include the "non-products" theory of coverage.

litigation or the Asbestos-Related Cases [against Thorpe], including the right to assert the applicability of any policy interpretation, policy defense, or other defense with respect to asbestos-related litigation or Asbestos-Related Cases [against Thorpe] against such person or entity." A further reservation of rights paragraph again indicates that the excess carriers reserve all rights "to seek reallocation, reimbursement, declaratory relief, contribution, indemnity or any other relief" from any party or nonparty to the agreement. The 1998 Agreement provides that nothing in the agreement "shall be construed to operate so as to alter, amend or waive any of the terms, conditions, exclusions, provisions, or obligations of any applicable policy of insurance." The 1998 Agreement specifically provides that, except as expressly stated, the agreement does not modify the insurance policies. The 1998 Agreement sets forth a method by which defense costs and indemnity payments are to be shared among the parties to the agreement. Significantly, the 1998 Agreement considers an excess insurer's policy to be implicated when the underlying primary policy is "contend[ed to] have been exhausted." That is to say, the 1998 Agreement does not appear to require an actual determination that a primary policy has been exhausted in order to implicate the relevant excess policy, but only that the primary insurance "claims to be exhausted by the payment of claims." Under the 1998 Agreement, the obligations of any first level excess insurer that is a party to the agreement shall cease once that insurer's aggregate policy limits have been exhausted.

On November 4, 1998, Chicago Insurance Company (Chicago), an excess insurer who was a party to the 1998 Agreement, and is a party to this action, responded to Thorpe's request for defense and indemnity. Chicago sent Thorpe a letter advising Thorpe of its "general position concerning the claims and to provide Thorpe with an outline of Chicago's intended actions in responding to these claims." Chicago denied coverage, but nonetheless indicated it had entered into the 1998 Agreement to participate in the adjustment and settlement of the claims, with the full reservation of its rights. Specifically, Chicago indicated that it "reserve[d] its right to contend that some or all of the subject claims, including claims previously settled by Thorpe's primary insurers, do not arise out of the Completed Operations/Products exposures and therefore may still be covered under one or more of the underlying primary policies."

Thorpe was not a party to the 1998 Agreement, but was provided with a copy. On December 8, 1998, Thorpe acknowledged receipt of the agreement and noted, "Of course, Thorpe reserves all of its rights under the policies."

In August 1999, Thorpe wrote to two of its primary carriers, which had been parties to the 1984 Agreement, but are not parties to the instant action, arguing that those carriers should be handling certain asbestos claims—

specifically, those for negligent installation of asbestos insulation—as non-products claims that were not subject to aggregate policy limits. Thorpe specifically challenged those insurers' claims of policy exhaustion, on the basis that negligent installation claims are not subject to aggregate policy limits. Indeed, Thorpe demanded that those carriers "immediately reimburse the excess carriers for the sums that they have paid for the defense and indemnification of the underlying actions." On September 21, 1999, Thorpe filed suit against those insurers and sought a declaratory judgment that non-products coverage applied to negligent installation claims. The suit proceeded to arbitration, where, in 2002, an award was entered in favor of the insurers. In March 2005, in apparent response to an inquiry by its excess insurers, Thorpe allegedly represented that it would not seek non-products coverage against them.

On November 14, 2005, Thorpe filed its initial complaint in this matter. Thorpe alleged that the insurers' policies contained aggregate limits, if at all, only for products and/or completed operations claims. Thorpe alleged that some of the policies defined "completed operations" in a manner that was indecipherably ambiguous.[6] Thorpe sought a declaration that the insurers have the burden of establishing each underlying claim is a products or completed operations claim in order for that claim to be charged against the policy's aggregate limits.[7]

The trial court found it appropriate to hold several "phased" trials, each addressed to discrete matters. The first trial, scheduled for May 2008, is to be devoted to policy interpretation.

---

[6] Thorpe cited to *United States Elevator Corp. v. Associated Internat. Ins. Co.* (1989) 215 Cal.App.3d 636 [263 Cal.Rptr. 760] as authority that purportedly found the definition in certain of the insurers' policies to be indecipherably ambiguous. In that case, the insured had been sued for negligent servicing of elevators, and the issue was whether those claims fell within the products/completed operations clause of the insurance policy. The policy language excluded from completed operations those operations " 'for which the classification stated in the policy or in the Company's manual specifies "including completed operations." ' " (*Id.* at pp. 643–644, italics omitted.) Evidence ultimately indicated that the referenced "Company's manual" was not a manual of either the insured or the insurer, but, in fact, a manual prepared by the Insurance Service Office, "a statistical gathering organization which prepares insurance rates and forms." (*Id.* at p. 644.) The trial court expressly found this provision to be indecipherable, and, on appeal, there was no argument that this finding was not supported by substantial evidence. (*Id.* at p. 648.) We are not certain what relevance this opinion has to Thorpe's assertion that claims arising from asbestos installation activity fall outside the scope of products/completed operations coverage.

[7] In this writ proceeding, the insurers argue that Thorpe previously took the position that asbestos suits constituted products claims and is now arguing that asbestos suits constitute non-products claims. As alleged in Thorpe's complaint, however, there is no clear dichotomy. Thorpe is currently contending that *some* asbestos suits constitute non-products claims. Thorpe does not clearly identify which suits it contends constitute non-products claims; it argues that this should be the insurers' burden.

In February 2007, Thorpe filed a first amended complaint, adding causes of action for damages for breach of contract and for bad faith, among others. Thorpe specifically alleged that the insurers' intentional mischaracterization of the asbestos claims as products claims rather than non-products claims constituted bad faith. However, Thorpe has indicated that its action is limited only to currently pending and future asbestos suits. That is, Thorpe is not seeking relief for any mischaracterization of *former* suits as products claims.[8]

In February 2007, Thorpe filed a motion for summary adjudication of the insurers' affirmative defenses of waiver, estoppel, ratification and laches. Thorpe also filed a motion in limine to exclude evidence of the parties' postcontract course of performance in the policy interpretation trial.[9] Thorpe's motion in limine was based on three arguments: (1) course of performance evidence is not relevant to the interpretation of standard form contracts, and, in fact, should have no place in the interpretation of insurance policies; (2) much of the course of performance evidence which the insurers were likely to introduce was the product of the 1984 and 1998 Agreements, which specifically state they are not to be used for policy interpretation; and (3) the insurers' interpretation of the contracts was unreasonable.

The insurers' opposition to the motion for summary adjudication stated that the insurers "have never argued that their policies do not provide for so-called 'operations' coverage for certain types of claims. Rather, the [i]nsurers' position, which we believe is supported by the policy language and the parties' nearly three decades of agreement, is that claims based on the inherently dangerous nature of asbestos products do not fall within such coverage." The insurers argued that Thorpe knew of the existence of the "operations" theory since at least 1984, but nonetheless treated all asbestos claims as products claims subject to aggregate policy limits. The insurers argued that Thorpe's handling of the claims, including the 1984 and 1998 Agreements, reflected an understanding that asbestos claims were products claims. The insurers further argued that Thorpe's treatment of the asbestos claims as products claims enabled Thorpe to receive $150 million in excess

---

[8] Specifically, the record before us reflects that Thorpe indicated to the trial court that it had not yet decided whether to seek damages for the misallocation of suits that had already been resolved, and the proceedings giving rise to this writ petition proceeded on the basis that Thorpe was not seeking such damages. The record also demonstrates, however, that Thorpe believed that the damages causes of action added by its first amended complaint would encompass claims for damages arising from the mischaracterization of former suits, should Thorpe later choose to proceed on that basis.

[9] As the insurers had not yet filed an answer to the first amended complaint, the parties stipulated that the motion for summary adjudication and motion in limine were nonetheless "procedurally ripe" and could proceed. As discussed below, the insurers argue in this writ proceeding that the motion in limine was premature, in that discovery had not been completed. Thorpe argues that the stipulation that the motion was "procedurally ripe" undermines this argument. It does not; the stipulation pertained only to the consideration of these motions prior to a responsive pleading having been filed to the operative complaint.

coverage to which it otherwise might not have been entitled. On the basis of Thorpe's history of handling the insurance claims as products claims, the insurers argued that triable issues of fact existed as to its affirmative defenses of laches, waiver, estoppel, and ratification. The insurers supported their opposition with three volumes of exhibits, reflecting Thorpe's history of handling the asbestos claims.

In opposition to the motion in limine, the insurers argued that: (1) course of performance evidence is admissible to aid in the interpretation of *all* contracts, including form insurance policies; (2) the 1984 and 1998 Agreements are no bar, because the parties' performance was based on the insurance policies, not the agreements, and, in any event, the excess carriers were not parties to the 1984 Agreement and Thorpe was not a party to the 1998 Agreement; (3) the policies are reasonably susceptible of the insurers' interpretation; and (4) the evidence is admissible to rebut Thorpe's allegation that the policy language is ambiguous. The insurers also argued that all extrinsic evidence should be provisionally admitted, and ultimately allowed if it supports a reasonable interpretation of the contract.[10] The insurers incorporated into their opposition the exhibits and declarations accompanying their opposition to the motion for summary adjudication.[11]

After a hearing, the court granted both the motion for summary adjudication and the motion in limine. As to the motion in limine, the court granted it on two bases. First, the court noted that evidence of course of performance, while generally relevant, is only relevant if it *predates* any controversy. As the 1984 Agreement indicated the existence of a controversy in 1984, no course of performance evidence after that date would be relevant. Second, the court indicated that course of performance evidence is only relevant if it sheds light on the intention of the parties at the time of contracting. Reasoning that the individuals who negotiated the insurance contracts were not the same individuals who performed under them, the court concluded the

[10] In the instant writ proceeding, the insurers argue that the motion in limine was premature, in that the motion was a "highly irregular attempt to exclude large swaths of unspecified evidence a year before trial." The insurers did not oppose the motion in limine on this basis. In their response in support of the writ petition, the insurers state that they had, in fact, argued "that 'Thorpe's motion should be denied as premature . . . .' " The quoted argument stated, in full, "[i]n the alternative [to denying the motion on the merits], Thorpe's motion should be denied as premature so that the Court may provisionally admit and review all credible evidence of the parties' course of performance." While the insurers did note, *parenthetically*, that Thorpe's motion was made "without any discovery," and "before the parties even have an opportunity to fully discover just what th[e] evidence is," the insurers never made an argument, with any citation to authority, that the motion in limine should be denied as premature.

[11] The insurers argue that the trial court's ruling on the motion in limine barred "three decades' worth of relevant evidence, sight unseen." As the insurers had incorporated by reference the exhibits in support of their opposition to the motion for summary adjudication, the trial court had before it three volumes of such evidence.

course of performance evidence was not relevant. The court specifically declined to reach the issue of whether the insurers' interpretation of the policies was reasonable.

The insurers filed a timely petition for writ of mandate, challenging only the grant of the motion in limine, not the grant of summary adjudication. We issued an order to show cause.

## ISSUES FOR RESOLUTION

It is important to recognize that the trial court's ruling on the motion for summary adjudication of the insurers' affirmative defenses is not before us. We are therefore not concerned with the issues of whether Thorpe's failure for 20 years to assert non-products coverage against the insurers constitutes laches; whether Thorpe's acceptance of $150 million in excess coverage estops it from asserting the primary policies were not exhausted; whether Thorpe's assertion that it would not pursue the non-products theory against the excess insurers constitutes waiver of the right to assert that theory; and so forth. The *only* issue with which we are concerned in this proceeding is whether the court erred in concluding the claims handling history of the parties is not relevant to the issue of *policy interpretation.*

Preliminarily, we conclude that course of performance evidence is generally admissible in the context of interpretation of insurance policies, even standard form policies. We further conclude that the admissibility of course of performance evidence does not depend on the individual performing being the individual who had negotiated the contract. We therefore conclude the trial court erred in its alternative conclusion that course of performance evidence was inadmissible in this case for that reason.

However, course of performance evidence is relevant to the issue of contract interpretation only when the course of performance is attributable to the parties' understanding of the contract. In this case, the 1984 and 1998 Agreements, not the policies, governed the bulk of the parties' performance. Therefore, we conclude the trial court did not err in excluding evidence of performance following the 1984 Agreement. As it is not clear whether the insurers seek the admission of evidence of performance predating the 1984 Agreement, we direct the trial court to vacate its order granting the motion in limine in its entirety and to enter an order granting the motion in limine only to the extent of evidence of course of performance evidence following the 1984 and 1998 Agreements.

## DISCUSSION

### 1. Standard of Review

"The abuse of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113 [40 Cal.Rptr.3d 118, 129 P.3d 321].) "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*Ibid.*)

The insurers suggest that de novo review is the appropriate standard, on the basis that the trial court's exclusion of an entire category of evidence is akin to a ruling on a general demurrer or a motion for judgment on the pleadings. We disagree. The trial court did not rule on the motion in limine in favor of Thorpe on any of its causes of action or the insurers' affirmative defenses. The court made no rulings regarding the interpretation of the insurance policies. The court simply concluded that certain evidence that would be proffered by the insurers on the issue of contract interpretation was inadmissible for that purpose. The abuse of discretion standard applies.

### 2. General Rules of Insurance Policy Interpretation

■ "Although insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citations.] Thus, the mutual intention of the contracting parties at the time the contract was formed governs. [Citations.] We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. [Citations.] We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation. [Citations.] We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. [Citations.] [¶] ■ A policy provision is ambiguous if it is capable of two or more reasonable constructions. [Citations.] In determining if a provision is ambiguous, we consider not only the face of the contract but also any extrinsic evidence that supports a reasonable interpretation. [Citation.] Even apparently clear language may be found to be ambiguous when read in the context of the policy and the circumstances of the case. [Citations.] [¶] If policy language is ambiguous, an interpretation in favor of coverage is reasonable only if it is consistent with the objectively reasonable expectations of the insured. [Citation.] Thus, the court must determine whether the coverage under the policy that would result from such a construction is

consistent with the insured's objectively reasonable expectations. [Citation.]" (*London Market Insurers v. Superior Court* (2007) 146 Cal.App.4th 648, 655–656 [53 Cal.Rptr.3d 154].)

### 3. *General Rules Governing Admissibility of Course of Performance Evidence*

■ Extrinsic evidence can be offered not only "where it is obvious that a contract term is ambiguous, but also to expose a latent ambiguity." (*Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232, 1241 [88 Cal.Rptr.2d 777].) Such evidence is admissible when " 'relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' " (*Ibid.*)

■ The use of "course of performance" evidence as extrinsic evidence is acknowledged in case law and was ultimately codified in Code of Civil Procedure section 1856. (Cal. Law Revision Com. com., reprinted at 20A West's Ann. Code of Civ. Proc. (2007 ed.) foll. § 1856, p. 11.) As with all extrinsic evidence, course of performance evidence can be used not only to interpret an ambiguity, but also to reveal one in language otherwise thought to be clear. (*Ibid.*)

■ While the parol evidence rule provides that terms set forth in an integrated writing "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement" (Code Civ. Proc., § 1856, subd. (a)), the statute goes on to provide that the terms set forth in an integrated writing "may be explained or supplemented by course of dealing or usage of trade or by course of performance." (Code Civ. Proc., § 1856, subd. (c).) The Law Revision Commission comments note that "[i]t is expected that the courts will look to the definition[] in Commercial Code Section[] 1205 . . . for guidance in interpreting the meaning of the term[] . . . 'course of performance.' " (Cal. Law Revision Com. com., reprinted at 20A West's Ann. Code of Civ. Proc. (2007 ed.) foll. § 1856, p. 11.) The referenced California Uniform Commercial Code section was subsequently renumbered to section 1303. It defines a "course of performance" as "a sequence of conduct between the parties to a particular transaction that exists if: [¶] (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and [¶] (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection." (Cal. U. Com. Code, § 1303, subd. (a).)

Not only is a course of performance relevant "in ascertaining the meaning of the parties' agreement," it may "supplement or qualify the terms of the

agreement" (Cal. U. Com. Code, § 1303, subd. (d)) or "show a waiver or modification of any term inconsistent with the course of performance." (Cal. U. Com. Code, § 1303, subd. (f); see *Wagner v. Glendale Adventist Medical Center* (1989) 216 Cal.App.3d 1379, 1388 [265 Cal.Rptr. 412] [conduct antithetical to a term of a written contract which induces the other party to rely on the conduct can amount to a modification of the contract].)

■ The rationale for the admission of course of performance evidence is a practical one. "[W]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court. [Citation.] The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention." (*Universal Sales Corp. v. Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761–762 [128 P.2d 665].) "The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions." (*Kennecott Corp. v. Union Oil Co.* (1987) 196 Cal.App.3d 1179, 1189 [242 Cal.Rptr. 403].) "This rule of practical construction is predicated on the common sense concept that 'actions speak louder than words.' Words are frequently but an imperfect medium to convey thought and intention. When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent." (*Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 754 [8 Cal.Rptr. 427, 356 P.2d 171].) "The principle of 'practical construction' applies only to acts performed under the contract before any dispute has arisen." (*Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 296 [85 Cal.Rptr. 444, 466 P.2d 996].)

4. *General Admissibility of Course of Performance Evidence to Interpret the Insurance Policies at Issue*

■ Since insurance policies "are still contracts to which the ordinary rules of contractual interpretation apply" (*London Market Insurers v. Superior Court, supra*, 146 Cal.App.4th at p. 655), it is apparent that the rules relating to course of performance as extrinsic evidence are equally applicable to insurance policy interpretation.[12] The trial court, however, concluded that course of performance evidence is not admissible to interpret the insurance policies in this case. The trial court reasoned that since the main goal of contract interpretation is to determine the intent of the parties at the time of

---

[12] Thorpe does not pursue in this proceeding its earlier argument that course of performance evidence is simply inapplicable to the interpretation of insurance policies.

contracting, course of performance evidence is not relevant unless it can be shown that the individuals who performed were also the individuals who had negotiated the contracts.[13]

■ We conclude the trial court was mistaken. Preliminarily, we note that the parties have not cited, nor has independent research disclosed, any authority that expressly limits the admissibility of course of performance evidence in this fashion.[14] In any event, we find that this limitation is not required by the rationale that justifies the admission of course of performance evidence. The very purpose of the admission of course of performance is the commonsense belief that when the parties perform under a contract, without objection or dispute, they are fulfilling their understanding of the terms of the contract. This is true *regardless* of the actual language of the contract, as long as the parties' interpretation is reasonable. If the parties to a contract have, for years, harmoniously performed the contract in a way that reflects a particular, reasonable understanding of the terms of the contract, that performance is relevant to determining the meaning of the contract. It should not matter whether the parties' agents who originally drafted the contract participated in the performance, or have long since left the scene. Indeed, if parties harmoniously performed for years under a particular understanding of the contract, there is no reason why that performance should be considered irrelevant to the meaning of the contract even if the contract was drafted by the parties' predecessors in interest or was a preprinted standard form contract. Moreover, under California Uniform Commercial Code section 1303, course of performance evidence can supplement, qualify, or modify contrary terms in the contract. This would be largely undermined if course of performance evidence could only be considered when limited to the performance of the individual who drafted or negotiated the contract on behalf of the party.

■ In this case, the parties to the insurance contracts are the insurers and Thorpe, not the particular individuals who may have actually negotiated or

---

[13] The trial court also found significant on this point the fact that the policies were standard form policies. The insurers argue that this is factually incorrect, and that some of the policies at issue were not standard form policies. We need not address the factual dispute as we conclude the trial court erred in its interpretation of the law.

[14] Thorpe relies on a footnote in *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807 [274 Cal.Rptr. 820, 799 P.2d 1253], which reads as follows: "[B]oth the insurers and [the insured] have requested that we take judicial notice of documents allegedly indicating the view the other has taken of the CGL policies in connection with litigation and activities unrelated to this case. Because our focus here is on the intent of the parties at the time the policies were formed, the evidence contained in these documents is immaterial to our decision." (*Id.* at pp. 823–824, fn. 9.) This footnote appears to be in response to the parties' efforts to use their opponents' statements in other cases as a basis for judicial estoppel, not a discussion of the admissibility of the parties' own course of performance under the insurance policies there at issue.

signed the policies on behalf of those entities. Similarly, the parties whose performance is at issue are the insurers and Thorpe, not the individuals who handled the claims on their behalf. It is their performance which is relevant. The trial court abused its discretion to the extent it concluded that all course of performance evidence is inadmissible unless it was the performance of the very individuals who had actually negotiated or executed the contract on behalf of the parties.

### 5. Course of Performance Evidence After the 1984 and 1998 Agreements

With respect to the impact of the 1984 and 1998 Agreements, the trial court reasoned that the evidence was inadmissible because course of performance evidence is only relevant to the extent it occurred *prior* to the existence of a dispute, and the 1984 Agreement evidenced a dispute existent as of that time. We conclude that the trial court's conclusion was correct, although for a more basic reason than the existence of a dispute. Specifically, after the 1984 and 1998 Agreements, the actions of the parties were taken in conformity with the 1984 and 1998 Agreements, not the insurance policies. As the point is more readily apparent with respect to the 1998 Agreement, we consider that agreement first.

Thorpe's first layer excess carriers entered into the 1998 Agreement, which was denominated an "interim" agreement whose express purpose was to adopt "an interim mechanism for allocating" the costs of defense and indemnity among the excess carriers without having any effect on their rights. Under the 1998 Agreement, excess carriers agreed to begin payment when the applicable primary policies "claim[ed]" to be exhausted by the payment of claims. The 1998 Agreement repeatedly reserved the rights of the excess insurers, specifically including the rights to "seek reallocation, reimbursement, declaratory relief, contribution, indemnity or any other relief" from any party or nonparty to the 1998 Agreement. Indeed, at the same time that Chicago informed Thorpe that it had signed the 1998 Agreement and would be performing under it, Chicago expressly informed Thorpe that it "reserve[d] its right to contend that some or all of the subject claims, including claims previously settled by Thorpe's primary insurers, do not arise out of the Completed Operations/Products exposures and therefore may still be covered under one or more of the underlying primary policies."

Thorpe was not a party to the 1998 Agreement, but was provided a copy.[15] Thereafter, Thorpe informed the excess carriers when the underlying primary

---

[15] The fact that Thorpe was not a party to the 1998 Agreement is not relevant. We are here concerned with whether the history of claims handling after the 1998 Agreement constitutes a "course of performance" under the insurance policies such that it can be used for policy interpretation. As the post-1998 claims handling constituted a course of performance under the

policies claimed exhaustion, and the excess carriers performed their obligations. The insurers now contend that this performance was actually performance *under* the excess policies themselves, and is therefore course of performance evidence relevant to the interpretation of the policies.[16] They argue that Thorpe obtained tens of millions of dollars in excess coverage proceeds based on the shared understanding that all of the asbestos claims against Thorpe were products claims. But it is apparent that Thorpe obtained the excess coverage proceeds because the excess insurers had agreed among themselves to make those payments while reserving all of their rights to subsequently contend the payments were not, in fact, due under the policies. Indeed, Chicago *expressly reserved* to itself the right to argue that the asbestos claims *were not* products claims, while it nonetheless paid them. For Chicago to now contend that its payment of those claims reflected a shared understanding with Thorpe that the claims *were* products claims is disingenuous at best.

The 1998 Agreement appears to be an effort by Thorpe's insurers to promptly pay the asbestos claims with the understanding that the ultimate liability for those claims—whether held by the excess carriers, primary carriers, Thorpe itself, or a third party—would be resolved at a later date. Thorpe's acceptance of those payments cannot in any way be used to interpret the insurance policies, as, from that point on, the excess carriers were acting pursuant to the 1998 Agreement and *not* under the policies themselves.[17]

A similar conclusion follows with respect to the 1984 Agreement, between Thorpe and 10 of its primary carriers. Unlike the 1998 Agreement, the 1984 Agreement was not an "interim" agreement, but an actual *settlement* between the insurers and Thorpe. The 1984 Agreement provided that it "is the result of a compromise accord and is a compromise settlement of disputed claims. It is the product of arms length negotiations, is not intended to nor shall it be construed as the admission of the existence of a policy or as a policy

---

1998 Agreement, not the insurance policies, it cannot be used for policy interpretation, regardless of whether Thorpe was a party to the 1998 Agreement.

[16] The insurers' argument considers Thorpe's 30-year history of claims handling as an indivisible whole that the insurers contend should be used for policy interpretation as a whole. The insurers are, in this respect, overstating their case. Course of performance evidence is admissible only to interpret the contract under which the parties were performing. To the extent Thorpe's course of performance under the excess policies is relevant, it would be relevant only to the interpretation of the excess policies.

[17] Again, we are concerned only with the insurers' attempt to use Thorpe's course of conduct as course of performance evidence to interpret the insurance policies. We do not consider whether Thorpe's acceptance of these excess payments estops it from asserting the payments were not owed.

interpretation, and shall not be used in any Court or Arbitration to create, prove or interpret the obligations under general liability or other liability policies."

It is apparent that the claims handling conduct between Thorpe and its primary carriers following the 1984 Agreement was taken pursuant to the 1984 Agreement, not the policies themselves. The parties had resolved their differences regarding the claims and reached an agreement under which the primary insurers would pay their policy limits and no more; their subsequent conduct was governed by that agreement. The insurers argue that, at the time of the 1984 Agreement, there was no dispute over whether asbestos claims were products or non-products claims, so the 1984 Agreement is actually *further* evidence of the parties' conduct, which simply reflects an unspoken understanding that asbestos claims were to be treated as products claims. We disagree. The 1984 Agreement expressly states that it is *not* a policy interpretation and shall *not* be used in any court to interpret the policies. It therefore cannot be considered to be evidence of the parties' interpretation of the policies. As the agreement cannot be considered for policy interpretation, we similarly conclude that conduct *pursuant to* the agreement cannot be considered for the purpose of policy interpretation.[18]

We note that both the 1984 and the 1998 Agreements appear to have been entered into as part of a good faith effort to pay the claims of numerous injured third parties, without requiring litigation over the precise scope of each insurer's duty. This private resolution of the issues apparently resulted in the prompt payment of nearly $180 million to injured individuals, for which the parties are to be commended. This conduct, however, was clearly accomplished by means of the 1984 and 1998 Agreements, and was not simply a product of Thorpe and its insurers harmoniously performing under a joint understanding of the underlying policies.[19] It therefore is inadmissible for policy interpretation.

### 6. *Course of Performance Prior to the 1984 Agreement*

It is unclear whether the insurers wish to rely on any course of performance evidence prior to the 1984 Agreement.[20] In the insurers' opposition to

---

[18] We do not consider whether Thorpe's present assertion that some asbestos claims are non-products claims is, in any way, barred by, or a breach of, the 1984 Agreement.

[19] Indeed, the insurers' position describes the lengthy claims history as decades of "negotiations, representations and agreements." This is not simple performance under a joint understanding of the policies.

[20] It is also unclear whether the insurers seek to rely on any course of performance evidence *after* the 1984 Agreement, but not attributable to it or the 1998 Agreement—for example, claims practices with respect to insurers that were not parties to those agreements.

the motion for summary adjudication of their affirmative defenses, they argued that Thorpe knew of the existence of the "non-products" theory of coverage since "at least 1984," and appeared to rely largely on performance following that date. In their writ petition, however, the insurers argue that there were many years of "course of performance" evidence that predated the 1984 Agreement.

Relying on the insurers' assertion that Thorpe knew of the existence of the "non-products" theory in 1984, Thorpe argues that any course of performance evidence prior to that date would be inadmissible, in that the insurers would be unable to prove that Thorpe *understood* that it was accepting performance in a way that interpreted the policies to have no non-products coverage for asbestos suits. (See Cal. U. Com. Code § 1303, subd. (a) [course of performance evidence requires the party accepting performance to do so "with knowledge of the nature of the performance"].) We disagree. While it may ultimately be the case that the insurers could not establish this prerequisite for admissibility, Thorpe did not bring its motion in limine on this basis, so the insurers were never required to establish the foundation for the admissibility of pre-1984 course of performance evidence. Pre-1984 course of performance evidence therefore cannot be excluded on this basis.

Thorpe also contends that no course of performance evidence is admissible on the issue of whether certain asbestos suits fall within the non-products coverage of the insurance policies, on the basis that the insurers' interpretation of their policies to exclude such coverage is not reasonable as a matter of law. The trial court expressly declined to reach this issue. We do not disagree. The entire first phase of the trial is to be occupied with this issue; it cannot be resolved in passing on a motion in limine. In any event, Thorpe's showing on the motion in limine was wholly inadequate to enable a court to make this determination. While Thorpe's motion for summary adjudication did contain the relevant policy language, Thorpe never identified with any specificity any asbestos suits, or types of asbestos suits, that it believed fell within the scope of the non-products coverage of its policies. Thorpe seems to take the position that since it is theoretically possible to conceive of an asbestos suit that falls within non-products coverage, the insurers' position is necessarily unreasonable. But without knowing anything about the nature of the underlying suits at issue, it is impossible to determine whether the insurers' position that the suits *against Thorpe* do not fall within non-products coverage is reasonable.[21] Thorpe has therefore failed in establishing this alternative basis for excluding course of performance evidence.

---

[21] In any event, we note that the opinion in *Fibreboard Corp. v. Hartford Accident & Indemnity Co., supra,* 16 Cal.App.4th at pp. 500–502, rejected an insured's claim that asbestos suits based on failure to warn and several other theories fell within non-products coverage. While this authority does not control the issue in this case, it suggests that the insurers' position is not so unreasonable as to be rejected outright in the course of a motion in limine.

## DISPOSITION

The petition for writ of mandate is granted in part. The trial court is directed to vacate its order granting the motion in limine, and enter a new and different order consistent with the views expressed in this opinion. The parties are to bear their own costs in this writ proceeding.

Klein, P. J., and Kitching, J., concurred.

On April 22, 2008, the opinion was modified to read as printed above.