Filed 10/31/13  Lingo v. Microsoft CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CHARLES J. LINGO et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>        Defendant and Respondent. | A136531<br><br>(San Francisco City & County<br>Super. Ct. No. JCCP4106) |

Plaintiffs in this class action lawsuit appeal from a postjudgment order directing the court-appointed settlement claims administrator to implement a procedure for determining the portion of settlement proceeds to be awarded to certain class members who had purchased eligible software products from defendant Microsoft.  The trial court ruled that the procedure, which was developed by the parties themselves, did not violate the terms of the underlying settlement agreement.  Plaintiffs contend the order must be overturned as the authorized procedure "deprives class members of their substantive rights and their promised share of the $1.1 billion settlement in this action."  We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. The Lawsuit And Settlement Agreement

On June 16, 2003, the parties settled the underlying antitrust class action lawsuit by executing a settlement agreement that requires respondent to pay up to $1.1 billion to California businesses and consumers who had purchased licenses for certain of

1

defendant's software products and who submitted settlement claims.[1]  Under the agreement, the amount awarded to each claimant was to be determined by the number of eligible software license purchases the class member made during the period from 1995 to 2001.  After each participating class member submitted a claim, the court-appointed settlement claims administrator, Rust Consulting, Inc. (Rust), was authorized to review the records of the software purchases and calculate the settlement award based on established amounts for each type of purchased license.  Rust was then to issue settlement vouchers that could be redeemed by the claimants for cash.

## II.  *Volume License Claims Processing*

According to plaintiffs, the vast majority of software licenses that are eligible for settlement awards were sold to thousands of large business purchasers that participated in defendant's volume licensing program (volume claimants).  Defendant does not sell its software directly to these customers.  Instead, it supplies its software through a network of authorized software resellers, including computer manufacturers that provide pre-installed software on the computers they sell (referred to as original equipment manufacturers, or OEM's), as well as software distributors, systems integrators, and retailers that sell standalone software (collectively referred to here as resellers).

According to defendant, when the claims submission period closed on January 8, 2005, Rust had received over 4,550 volume claims encompassing over 20 million licenses.  Pursuant to the terms of the settlement agreement, the transaction records used to document these licenses were derived from (1) the claimants' own purchase records, (2) defendant's volume licensing records gathered from its end user database, and (3) "other credible written evidence" of eligible software purchases submitted by the claimants and accompanied by a sworn declaration made under penalty of perjury.

---

[1] We addressed the underlying litigation and the settlement agreement previously in *In re Microsoft I-V Cases* (2006) 135 Cal.App.4th 706.  The terms of the settlement agreement are described more fully in that opinion.

### III.  The 2006 Decision To Use Third-Party OEM/Reseller Data

As part of the 2003 settlement agreement approval process, plaintiffs' counsel had subpoenaed records of more than 70 third-party OEM's and other software resellers for the sole purpose of identifying potential class members.  In January 2006, after the claims submission period had closed,[2] plaintiffs' counsel first raised the idea of supplementing some volume claims using the software purchase records derived from this third-party reseller data.  The parties agreed that this information could be used to augment volume claims, provided that it did not duplicate licenses contained in defendant's records or in the claimants' own purchase records.[3]  Rust was given the responsibility to reconstruct an accurate accounting of the volume claimants' purchases of eligible software by determining which of the records from the different sources supplement one another, and which of them overlap—a process the parties call "de-duplication."

Rust began identifying duplicate records of volume claimant software purchases by comparing a number of characteristics, including the software product description, the date of purchase, the quantity purchased, the purchaser's address, the purchaser's designated contact person, and the identifying number of the agreement between defendant and the purchaser.  If those characteristics did not match under the criteria established by the parties, the records were considered nonduplicative.  Rust prepared an internal document entitled "OEM Tutorial," which it used to train its claims administration personnel on these processing rules.  Rust also conducted joint calls with the parties to explain its methodology, and to obtain the parties' approval of its procedures.

Rust processed numerous claims in accordance with the OEM Tutorial rules and posted the results for the parties to review.  Subsequently, Rust issued settlement vouchers to 1,391 volume licensee claimants after the parties approved its calculations.

---

[2] The claims submission period ended on January 8, 2005.

[3] Plaintiffs assert defendant agreed to this procedure because its own volume licensing records were discovered to be incomplete.  Defendant does not concur with this view.

However, as defendant's counsel reviewed sample claims in late 2007 and early 2008, it appeared the reseller data was incomplete and/or inconsistent, and that Rust's procedures were unsatisfactory in determining whether the licenses in the reseller records were the same as the licenses cataloged in defendant's end user database, referred to as the "License Information Repository" (LIR). For example, some of the resellers' records had no purchase dates, while others had multiple dates associated with each transaction. Some records contained imprecise product names. Others included addresses outside California, or contained incomplete address information. Still other records included a single license purchase recorded multiple times to reflect quarterly or annual installment payments.

## IV. *The February 2009 Addendum Agreement*

In December 2007, defendant asked Rust to stop issuing volume claim vouchers and began negotiating with plaintiffs' counsel to establish new rules for de-duplicating purchase records. According to defendant, plaintiffs' counsel agreed with its suggestion that, going forward, Rust could match reseller transaction records to defendant's LIR records if both records fell within a specified date range and reflected the same quantity of purchased licenses. The parties also agreed that Rust could match slightly different product descriptions and consider them duplicative, so long as it was convinced that the descriptions were intended to describe the same software product. The changes were memorialized in a written addendum to a February 2009 settlement claims processing agreement (the Addendum).

The Addendum begins by stating that the parties had not previously agreed on the de-duplication rules: "[The parties] agreed that claimants may use the [reseller data] to support their voucher claims. However, the parties *have not previously agreed* on how [this data] should be interpreted or how to eliminate duplication between Reseller Data and Microsoft records. Now that we have reviewed the potential claims records provided by [the resellers], we are concerned that, unless the parties agree to certain rules, Rust will be counting the same license more than once when determining voucher eligibility. To avoid that situation, we propose *the adjustments described below* to correct some

4

(though not all) of the duplication and other problems in the Reseller Data." (Italics added.) The document also states: "There is substantial duplication between the Reseller Data transactions and the Microsoft SSO report transactions,[4] particularly for volume licensing transactions. The parties therefore need to make some *minor adjustments* to the process currently being used by Rust to eliminate the duplication between the two data sets." (Italics added.)

The Addendum includes instructions on the procedures to be used in determining whether a license found in the reseller data should be deemed a duplicate of a license found in defendant's records. In comparing the two types of records, Rust was to consider three criteria: (1) purchase date matching period; (2) exact quantity match; and (3) product name match. For a license purchase to be deemed a duplicate, the purchase dates in the two records had to fall within a 32-day range, the license quantities purchased had to be the same, and the product names had to reasonably match along certain parameters (unless the reseller records did not contain sufficient detail to make this comparison). If all of the criteria matched, a purchase identified in both defendant's and the resellers' records would be considered a duplicate and the claimant could only recover once. If any of these criteria was not met, each transaction would be counted separately in determining the final voucher amount distributed to the claimant. According to defendant, Rust followed and implemented the Addendum's procedures with the oversight and guidance of the parties for over two and a half years.

## V. *The Dispute Arises And The Underlying Motion Is Filed*

In October 2011, plaintiffs' counsel asserted (reportedly for the first time) that Rust was required to consider other criteria in addition to date, product name, and quantity. He further contended that the reseller licensing records could not be treated as duplicates unless all of the additional information matched exactly. Specifically, according to defendant, plaintiffs' counsel claimed that the company names in each

---

[4] SSO was an extract of data that defendant pulled from its LIR electronic licensing records system to fulfill its data disclosure obligations under the settlement agreement.

matched record had to be identical. Shortly thereafter, he also asserted that other information, including individual contact names and address, had to match exactly for the records to be considered duplicates.

In plaintiffs' view, their counsel had never agreed to eliminate any of the de-duplication matching criteria that Rust had been using up until December 2007. Instead, in agreeing to the Addendum, he had merely authorized three "minor adjustments" to Rust's *existing* de-duplication process. Contrary to his intent, Rust "had mistakenly concluded that the changes to the product description, quantity and purchase date criteria listed in the [Addendum] for matching duplicate software purchase records were intended to completely replace Rust's existing de-duplication procedures . . . ." Defendant disagreed with plaintiffs' position. Per terms of the settlement agreement, when the parties cannot agree on the "rules and procedures" for processing claims, either party can bring the issue to the superior court by filing a motion.

On May 21, 2012, plaintiffs filed a motion "For Court Resolution of the Parties' Settlement Claims Processing Dispute and Enforcement of the Parties' Claims Processing Agreements."

On June 27, 2012, after hearing arguments from the parties, the trial court issued its order determining that the de-duplication procedures set forth in the Addendum were to govern the claims-processing task. The order reiterates that Rust should apply only the three criteria set out in the Addendum—date range, quantity, and product name—in determining whether purchase records are duplicates. Thereafter, Rust resumed its processing using these criteria. It certified to the court on August 15, 2012, that the de-duplication process was complete and that it was ready to issue volume claimant vouchers. This appeal followed.

**DISCUSSION**

### I. *Standard Of Review*

While plaintiffs assert we must apply a de novo standard of review to the trial court's interpretation of the Addendum, we have noted previously with respect to this class action settlement agreement that "[o]ur task is limited to a review of the record to

6

determine whether it discloses a clear abuse of discretion when the trial court's determination of fairness is challenged on appeal. We do not substitute our notions of fairness for those of the trial court or the parties to the agreement. [Citation.] 'To merit reversal, both an abuse of discretion by the trial court must be "clear" and the demonstration of it on appeal "strong." ' [Citation.]" (*In re Microsoft I-V Cases, supra,* 135 Cal.App.4th 706, 723.) While we announced that standard in the context of the order approving the underlying settlement agreement, plaintiffs do not persuade us that a different standard of review should apply to an order concerning a postagreement dispute involving settlement award calculations.

## II.  *The Trial Court's Order Does Not Violate The Settlement Agreement*

Plaintiffs assert the trial court erred in issuing its order because the ruling will deprive them of valuable benefits promised by the settlement agreement. They also claim the court violated their right to due process by modifying the agreement without giving them notice of the changes or an opportunity to object. We reject these contentions.

The challenged order merely implements the Addendum. It does not modify the terms of the settlement agreement. The settlement agreement itself allows the parties to determine how claims are to be processed and awarded. The relevant provision states: "The Settlement Claims Administrator [Rust], Lead Counsel for the California Class and Microsoft *will agree on the rules and procedures that will govern the processing of claims* under this Settlement Agreement and the administration of this Settlement generally." (Italics added.) This provision further states: "If [Rust] and the parties are unable to agree on any such rules or procedures, the parties *shall submit their disagreement to the Court* or to a referee appointed by the Court with the consent of the parties for resolution." (Italics added.)

In February 2009, in accordance with the terms of the settlement agreement, the parties negotiated, agreed, and approved the three-factor process to be used by Rust. Thereafter, in further adherence to the terms of the settlement agreement, the parties' dispute concerning the claims processing procedure was submitted to the trial court. Thus, the agreement has functioned exactly as the parties intended. Claimants possessing

7

valid claims, backed by nonduplicative business records as determined under the procedures the parties asked Rust to follow, will receive awards pursuant to the terms of the settlement agreement. Thus, no modification has occurred.[5]

We also disagree with plaintiffs' contention that the terms of the settlement agreement place the burden on defendant to challenge the veracity of the reseller records. This argument is based on the faulty premise that reseller records constitute "other written evidence" submitted as proof of a claim. The cited language is contained in the section of the settlement agreement that sets forth the initial procedures for filing a claim. It is undisputed, however, that the claims-filing deadline had already passed when plaintiffs' counsel first raised the possibility of using the reseller records to augment defendant's LIR records. Additionally, the reseller records were not accompanied by "a sworn declaration under penalty of perjury" as required by the settlement agreement's terms. Accordingly, plaintiffs' reliance on this provision is misplaced.

### III. Plaintiffs' Evidentiary Arguments Fail

Plaintiffs also assert defendant's opposition to their motion "failed to provide even a shred of evidence proving that any of the [materially different records at issue in this appeal actually] are duplicates." They claim the only authenticated evidence before the trial court proved the disputed records could not possibly memorialize the same software purchase transaction. In their brief, they cited two examples of records they claim were improperly entered as duplicates, one involving Raytheon Company and the other involving The Salvation Army. In both cases, Rust deemed the records to be duplicates because they showed purchases made less than 32 days apart. Plaintiffs offered evidence from officers of the two entities to demonstrate that these purchase records could not possibly be duplicates, either because they were not made by the same corporate entity, or because they were purchased at different locations by different employees.

---

[5] Our conclusion also disposes of plaintiffs' argument that the trial court erroneously utilized an unsigned agreement to alter the benefits promised to class members under the terms of the settlement agreement.

Defendant notes it submitted its own sworn declarations to the trial court, explaining why its records and a reseller's records could contain different company names, addresses, or contact names while reflecting the same license purchase. For example, defendant showed that its volume licensing agreements "routinely permit a licensee to authorize purchases by dozens of company affiliates—all of which would be recorded by [defendant] under the original licensee's name, address and contact information." Defendant also offered that it "does not routinely update its internal databases with changes in contact names or addresses that may show up in the reseller information." Further, at the hearing below defendant presented examples involving Levi Strauss & Company and Pacific Gas & Electric in support of its contention that the February 2009 rules constitute effective de-duplication measures. Plaintiffs countered that the examples were misleading.

Regardless, the trial court made it clear that the instant proceeding was not an evidentiary hearing. Instead, the court indicated that the central issue was the proper interpretation of the Addendum. Given that at the time of the hearing over 3,000 volume claims had yet to be processed, it would be extremely impractical for the court to become involved in individual license determinations.[6]

We also disagree with plaintiffs' contention that the trial court's order "*automatically require[s]* records to be designated as duplicates when the face of each record describes a different software purchase transaction." The court's order simply restates the terms of the Addendum. The whole point of the de-duplication process is to segregate those records that describe different software purchase transactions from those that describe the same transactions. The three parameters set forth in the Addendum represent one method for *eliminating* duplicate records, not for *requiring* nonduplicative records to be designated as duplicates. The prior rules as reflected in the OEM Tutorial

---

[6] We similarly decline plaintiffs' implicit invitation to comb through the voluminous documentation of purchase records they have included in the record on appeal.

set forth another method. Plaintiffs essentially find fault in a system that allows any potential for error.

As noted above, defendant provided evidence supporting the inference that some differences between the various records, such as addresses and contact names, can be explained by the different documentation procedures used by resellers. As the trial court explained to plaintiffs' counsel: "[T]his is an inexact effort by both sides to try and reach a system, a process to identify duplicate records. And it's inexact. It's not perfect. And so your effort to show that a certain way that it can be done would result in perfection is just not possible."[7]

## IV. *The Trial Court Properly Interpreted The Addendum*

Plaintiffs next assert the trial court's interpretation of the February 2009 addendum is erroneous. In so arguing, they rely on rules that apply to contract interpretation. Assuming the challenged document is a "contract,"[8] we conclude the court's interpretation is valid.

Plaintiffs claim the express language of the Addendum identifies the three matching procedures as "adjustments" only. They note the Addendum states that the parties intended "to make some *minor adjustments to the process currently being used by Rust* to eliminate the duplication between the two data sets." (Italics added.) Thus, they claim the Addendum contemplated preservation of the process then being used by Rust, with only a few minor adjustments. This argument is founded on the assumption that the parties sought to preserve the OEM Tutorial's de-duplication process. However, the

---

[7] Plaintiffs' broad assertion that "thousands of Reseller sales records in dispute all describe software purchase transactions that are materially different from every other record used to calculate the Claimants' settlement benefits" is unsupported by any fact-based analysis. Under the standard of review applicable here, we need not conduct an extensive and exacting review of the evidence offered by the parties. Suffice it to say, the materials supplied by plaintiffs on appeal do not persuade us that the trial court abused its discretion in issuing its order.

[8] It is unclear to us that the Addendum is a "contract" at all. As noted above, the settlement agreement provides: "The Settlement Claims Administrator, Lead Counsel for the California Class and Microsoft will agree on *the rules and procedures* that will govern the processing of claims under this Settlement Agreement and the administration of this Settlement generally." The Addendum itself contains such "rules and procedures."

10

Addendum does not reference any of the criteria contained in the OEM Tutorial. If the parties had intended to incorporate prior written procedures or criteria, they certainly could have said so. Thus, there is nothing in the plain language of the Addendum reflecting the intent plaintiffs would have us ascribe to it.

Plaintiffs' subjective understanding of the Addendum is not relevant to our analysis. "The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe." (*Meyer v. Benko* (1976) 55 Cal.App.3d 937, 942–943.) Additionally, subsequent conduct is relevant in ascertaining the meaning of the parties' agreement. (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 920–921.) In May 2010, after a number of rules relating to de-duplication and other volume claims issues had been established, Rust sent the parties a set of written followup questions. One question specifically asked which de-duplication rules Rust should be applying. The answer, approved by plaintiffs and defendant, states, in part: "For vouchers based on OEM/Reseller purchase records that had not been distributed to volume claimants as of February 5, 2009, [Rust] must calculate voucher awards based on the rules and procedures described in the parties' February 5, 2009 and December 23, 2009 Agreements, *even if [Rust] had previously calculated pending voucher awards for these OEM/Reseller records on a different basis. . . .*" (Italics added.) Plaintiffs also approved of Rust's new set of instructions to be used by its internal processing staff *in place of* the OEM Tutorial. Thus, objectively speaking, it appears plaintiffs acquiesced to the new rules.

Moreover, plaintiffs acknowledged to the trial court that the parties never negotiated or agreed to the rules contained in Rust's OEM Tutorial. They also admitted that the Addendum was the first written agreement that the parties had reached with respect to de-duplication. This further supports the court's finding that the Addendum was intended by both parties to reflect the only rules Rust was to follow with respect to all then outstanding claims.

Plaintiffs also contend the trial court violated its legal obligation to protect the interests of absent class members by issuing an order "*requiring* Rust to implement an *inequitable* de-duplication process." (Italics added.) They note defendant and the court acknowledged that proposed de-duplication rules will likely create imperfect results, as some licenses would be treated as duplicates when they were not, just as some claimants would receive more than one voucher for the same license. However, plaintiffs do not persuade us that there is, in fact, a perfect system available to process the large amount of claims given the state of the documentation available to document software purchases.[9] Apparently, the procedures outlined in the OEM Tutorial lead to imperfect results as well, otherwise the parties would not have agreed to make *any* adjustments to the work Rust had been doing. Keeping in mind the standard of review applicable here, plaintiffs have not conclusively established that the OEM Tutorial method of de-duplication is inherently superior to the method set forth in the Addendum.[10] Thus, we cannot hold that the trial court abused its discretion in issuing the challenged order.

---

[9] In this context, perfection is not required. Courts have observed that the trial court has broad discretion to determine whether a class action settlement is fair: " 'Ultimately, the [trial] court's determination is nothing more than "an amalgam of delicate balancing, gross approximations and rough justice." [Citation.]' [Citation.]" (*Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801.)

[10] In their reply brief, plaintiffs indicate that Rust has also processed the outstanding claims using the de-duplication procedures set forth in the OEM Tutorial, with the "minor adjustments" specified in the Addendum. By our ruling, we do not intend to discourage the parties from working together to achieve the fairest results possible without adding any undue delay to this rather protracted class action proceeding.

# DISPOSITION

The order is affirmed.

_____
Dondero, Acting P.J.

We concur:

_____
Banke, J.

_____
Sepulveda, J.*

* Retired Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.